UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SEAN K. WHITTLE, <br><br>                           Plaintiff, <br><br>         vs. <br><br> NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration, <br><br>                     Defendant. | 4:18-CV-04095-VLD <br><br><br> MEMORANDUM OPINION AND ORDER |

## INTRODUCTION

Plaintiff, Sean K. Whittle, seeks judicial review of the Commissioner's

final decision denying his application for child's insurance benefits (CIB) under

Title II and supplemental security income disability benefits under Title XVI of

the Social Security Act.[1]

---

[1] SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits (in this case CIB benefits) are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB/ benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. In the case of CIB benefits, however, the rule is based upon the parent's wage history and the adult child must prove he or she was disabled on or before the child turned twenty-two years old. 20 C.F.R. § 404.350. In this case, that date for Mr. Whittle would be in January 28, 2008.

There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

Mr. Whittle has filed a complaint and has requested the court to reverse the Commissioner's final decision denying him disability benefits and to enter an order awarding benefits. Alternatively, Mr. Whittle requests the court remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A. Statement of the Case

This action arises from Plaintiff, Sean K. Whittle's, ("Mr. Whittle"), application for child's insurance benefits and SSI filed on August 12, 2015, alleging disability since September 1, 2007, due to social phobia disorder, major depressive disorder, anxiety, borderline personality disorder, acid reflux, and chronic kidney stones. AR229, 236, 266. (citations to the appeal record will be cited by "AR" followed by the page or pages).

---

There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). On August 12, 2015, Mr. Whittle filed his application for both types of benefits. AR17.

[2] These facts are gleaned from the parties' stipulated statement of facts (Docket 18). The court has made only minor grammatical and stylistic changes.

Mr. Whittle's claims were denied initially and upon reconsideration. AR136, 139, 144, 151. Mr. Whittle then requested an administrative hearing. AR158.

Mr. Whittle's administrative law judge hearing was held on November 7, 2017, by Richard Hlaudy, ("ALJ"). AR38. Mr. Whittle was represented by other counsel at the hearing, and an unfavorable decision was issued on February 5, 2018. AR14, 38.

At Step 1 of the evaluation, the ALJ found that Mr. Whittle had not engaged in substantial gainful activity, ("SGA"), since the date of his alleged onset of disability, September 1, 2007. AR19. The ALJ reviewed Mr. Whittle's earning record and stated that his earnings in 2007, 2008, and 2009 did not exceed the minimum monthly threshold for substantial gainful activity in any of those years. AR19. The ALJ stated that a review of Mr. Whittle's earnings record showed that he had not earned income at substantial gainful activity levels on an annualized basis his entire life. AR26.

At Step 2, the ALJ found that Mr. Whittle had severe impairments of anxiety, bipolar disorder, depression, personality disorder, and substance abuse disorder. AR20.

The ALJ also found that Mr. Whittle was diagnosed with GERD and kidney stones, but determined they were non-severe. AR20.

At Step 3, the ALJ found that Mr. Whittle did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1 (20 CFR § 416.920(d), 416.925, and 416.926) (hereinafter

3

referred to as the "Listings"). AR20. The ALJ found Mr. Whittle had moderate limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations with concentration, persistence or maintaining pace; and moderate limitations in adapting or managing oneself, so did not meet a Listing. AR20-21.

The ALJ determined Mr. Whittle had the residual functional capacity ("RFC"), to perform a full range of work at all exertional levels but had non-exertional limitations that limited him to understanding, remembering and carrying out only simple, routine and repetitive tasks, and having only occasional and superficial contact with coworkers and the public. AR21.

The ALJ's subjective symptom finding was that Mr. Whittle's medically determinable impairments could reasonably be expected to produce the symptoms he alleged, but his statements concerning the intensity, persistence and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR23.

The ALJ considered the opinions of the State agency medical consultants who made a non-severe finding and gave them "great weight." AR26-27.

The ALJ noted that the State agency psychological consultant at the initial level found Mr. Whittle had "marked" limitations in activities of daily living, "marked" limitations in social functioning, and "moderate" limitations in concentration, persistence or maintaining pace, and also found that

Mr. Whittle's drug addiction and alcoholism ("DAA") was material. AR27. The ALJ considered those opinions and rejected the finding of material DAA stating, "While it is true that the claimant had significant alcohol and drug abuse issues early on in the relevant period resulting in multiple emergency room admissions for withdrawal symptoms, they were not accompanied by evidence of mental dysregulation or decompensation and he was not hospitalized for two weeks or longer. The claimant's functioning during that period, while certainly affected by drug and alcohol usage, did not result in the increased need for mental health treatment or hospitalizations." AR27. The ALJ afforded the opinion "little weight." AR27.

The ALJ considered the medical source statement completed by Mr. Whittle's treating case manager, Debby Bongers, who the ALJ noted had identified "moderate" to "marked" limitations in both Mr. Whittle's ability to maintain attention and concentration and in his ability to have social interaction, and accepted all "moderate" limits, but rejected all "marked" limitations asserting they were "inconsistent with the relatively stable mental status examination observations" noted in the case management and psychiatric treatment records, citing exhibits 8F, 22F, and 28F. AR26, 2234-36 (medical source statement).

The ALJ considered the statement of Mr. Whittle's treating psychiatrist, Dr. Bhatara, and accepted all "moderate" limitations he identified, but rejected the "marked" limitations Dr. Bhatara had identified in sustaining attention, social interaction, and adaptation. AR26. The ALJ stated he rejected the

"marked" limitations because they were "inconsistent with the relatively stable mental status examination observations" noted in the case management and psychiatric treatment records, citing exhibits 8F, 22F, and 28F.

The ALJ stated that Mr. Whittle was no more limited than he determined in the RFC because:

> The record before the undersigned establishes that the claimant had depression, anxiety, borderline personality disorder and substance abuse. The claimant's substance abuse issues are prevalent in the record warranting a finding for severity. However, they are not material to causing up to marked limitations in mental functioning. The treatment notes document numerous admissions for alcohol withdrawal symptoms and opioid drug seeking behavior early on in the relevant period. However, those emergency room admissions were of short duration and did not result in psychiatric inpatient treatment for mental decompensation. The claimant had little psychiatric treatment during the portion of the relevant period and the minimal mental status examination in the record during that time indicated he had normal functioning. More recently, as of 2014, the claimant's substance abuse habits changed to more of a binge nature. The claimant had some inpatient stays of very short duration that were not related to alcohol abuse and some that noted alcohol abuse. In those instances, the claimant's stays were of a short nature, he responded well to treatment with and without substances being a factor and was typically discharged within a day or two of admission and usually at his own request. The claimant has received case management services with consistent notations of poor hygiene and deficits of insight and judgment but otherwise normal mood, thought processes and no evidence of psychosis. Overall, the case management notes document relative stability in the claimant's functioning. Likewise, the more recent psychiatric treatment notes have documented deficits but relative stability in the mental status examination observations. The deficits registered do not rise to a marked degree of impairment. The claimant's reported activities of daily living are reduced, but consistent with the ability to perform unskilled work with reduced contact with others. The treatment notes also document issues of the claimant's truthfulness with providers and issues of malingering noted by attending providers that also weigh against the claimant's allegations. Therefore, based on the foregoing, the undersigned find [sic] the claimant is capable of performing work at all exertional

levels within the limitations of the residual functional capacity assessment set forth above.

AR27-28.

Based on the RFC determined by the ALJ and relying on the testimony from the vocational expert the ALJ first found that Mr. Whittle was capable of his past relevant work as a gas station clerk, citing DOT #211.462-010, as it is generally performed in the national economy. AR28. The ALJ cited to a disability report completed by Mr. Whittle where he reported working as a service clerk at a gas station from "March 2007 to April 2007" working 9 hours per day for six days per week and earning $7.50 per hour. AR28 (citing Exhibit 3E-4, AR268). The ALJ cited Mr. Whittle's earning record which indicated he earned $965 from Olson Oil Company (Get-n-Go) for the year 2007 and asserted that those earnings were more than the $900 minimum monthly threshold for substantial gainful activity in 2007. AR28. The ALJ cited the DOT definition of the job as having a vocational preparation (SVP) of 2, meaning it would take up to 30 days to learn the job. AR28. The ALJ stated, "therefore, the undersigned finds the claimant earned substantial gainful activity in that position for one month" and "that was sufficient time to learn the requirements of that job." AR28.

The ALJ stopped the sequential evaluation at Step 4 and found Mr. Whittle not disabled. AR28.

Mr. Whittle timely requested review by the Appeals Council. AR227.

The Appeals Council denied Mr. Whittle's request for review making the ALJ's decision the final decision of the Commissioner. AR1.

**B.      Plaintiff's Age, Education and Work Experience**

Mr. Whittle was born January 28, 1986, and completed two years of college in 2006.  AR229, 267.

The ALJ identified Mr. Whittle's only past relevant work as gas station clerk, DOT# 211.462-010, asserting Mr. Whittle performed that job for one month in 2007.  AR28.

**C.      Relevant Medical Evidence**

**1.      Avera Hospital, Avera Heart Hospital, Avera Behavioral Health, Sanford Hospital and clinics, Falls Community Health and SD Human Services Center (in chronological order)**

Mr. Whittle was seen in the Avera emergency room on July 30, 2006, with acute hepatitis most likely due to Vicodin/Tylenol overdose with 75 Vicodin pills taken over a 5-day period.  AR705.  Mr. Whittle was admitted and seen for a psychiatric evaluation.  He reported a history of abdominal pain related to kidney stones and had become addicted to Percocet for which he spent one month (April 27, 2006, to May 27, 2006) in rehab at Keystone. AR630, 697, 700. He reported treatment from Dr. Singh for depression and anxiety, and was taking Cymbalta, Remeron, and Seroquel. AR700. Mr. Whittle also reported being in counseling with Gretchen Starns at Sioux Valley. AR701. His GAF was assessed at 45. AR702. A mental status examination revealed that Mr. Whittle made good eye contact, his thoughts were clear and goal oriented, his attention and concentration were good, his mood was anxious, and he was guarded in discussing his stressors and his symptoms.  Id.  His insight and judgment were fair, but his judgment was somewhat impaired in

that he did not want to involve his outpatient psychiatric providers or inform them about his hospital admission. Id. Mr. Whittle was discharged the next day. AR695.

Mr. Whittle was seen in the Avera emergency room on September 5, 2006, worried about the condition of his liver due to some minor nausea, but his liver tests were almost normal. AR686. An examination revealed that Mr. Whittle was alert, oriented, pleasant, and cooperative, his neurological examination was grossly intact, and he was mildly to moderately anxious. AR686. However, he demonstrated significant amounts of anxiety and he was treated with Ativan, which significantly improved his symptoms. AR687.

Mr. Whittle was seen at the Avera emergency room on October 2, 2006, and was seeking help for Percocet abuse. AR666. His affect was flat, but he was not suicidal and he was referred to behavioral health services. AR667.

Mr. Whittle was seen in the Avera emergency room on November 21, 2006, for right flank pain suspected to be related to kidney stones, but the tests disproved that and pain medications were stopped and Mr. Whittle was told he would not receive any more and he ripped out his IV and left. AR659. In addition to his visits to the Avera ER the notes state that he had been seen at the Sioux Valley ER multiple times in November, and drug seeking behavior was diagnosed. AR659. Examination of Mr. Whittle's extremities revealed no evidence of trauma or edema and no significant amount of CVA or flank tenderness on either side. AR658.

Mr. Whittle was seen at the Avera emergency room on November 23, 2006, and was again seeking help for pain medication abuse. AR654. He was anxious but not suicidal and he left against medical advice. AR655. However, he returned to the ER the next day and was given a prescription for a clonidine patch and Zofran for opiate withdrawal. AR652.

Mr. Whittle was seen at Sanford Sertoma Clinic on November 30, 2006, complaining of pain related to kidney stones. AR1376. He received a Percocet prescription which was reduced to only 10 pills when the doctor discovered Percocet prescriptions he had received from multiple providers in the recent past. Id.

Mr. Whittle was seen at the heart hospital emergency room on December 7, 2006, complaining of right flank pain, and reported he had not been seen at any other Avera ER for about one month. AR419. Records were obtained which showed otherwise, and Mr. Whittle was confronted and admitted he had been trying to get drugs. AR421. Mr. Whittle received Toradol and Ultram. AR422.

Mr. Whittle was seen at the Avera emergency room on December 9, 2006, again for issues with Percocet abuse and withdrawal symptoms. AR648.

Mr. Whittle was transported to the Avera emergency room via ambulance on December 11, 2006, and admitted after overdosing on oxycodone. AR633. He had been found by the police driving down the wrong side of the road at very slow speed wearing sunglasses at night. Id. Mr. Whittle was admitted to the intensive care unit. AR634. A psychiatric exam revealed he was very anxious, confused, pacing, restless, dysphoric, and indignant. AR631.

Mr. Whittle's affect was quite labile, attention and concentration diminished, and oriented to self, but not date or place. Id. His GAF was assessed at 35-40, and a 5-day mental hold was initiated, and he was transported to the behavioral health center the next day, admitted to the acute adult program and put on 15-minute check and suicidal precautions. AR615, 624, 632. An examination at that time revealed that Mr. Whittle's thoughts were coherent and logical, he had no loosening of associations or suicidal ideation, he was quite disheveled with fair hygiene, his speech was rambling, he looked tired and drowsy, he had poor eye contact, his mood was dysphoric with restricted affect, his formal memory, attention and concentration could not be tested, and his insight and judgment were poor. AR614-5. Mr. Whittle's GAF was assessed at 35-40. AR615. Mr. Whittle's hold was dropped, and he was discharged on December 13, 2006, with plans for rehab treatment at Keystone starting December 14, 2006. AR612.

Mr. Whittle was seen at the Avera emergency room on December 27, 2006, for issues with Vicodin overdose, elevated liver enzymes with possible Tylenol toxicity, and he left the ER against medical advice. AR607. An examination showed his gait was stable, his cranial nerves were grossly intact, and he had no gross motor or sensory deficits. Id.

Mr. Whittle was seen at the Avera emergency room on January 9, 2007, his 11th ER visit since August, 2006, in an obvious altered mental state for a drug overdose. AR572, 587. Mr. Whittle arrived via ambulance following a 911 call when he was found wandering in an apartment complex naked covered in

his own feces. AR572, 586. Mr. Whittle was placed on a mental hold and admitted to the intensive care unit. AR573. On admission, Mr. Whittle's GAF was assessed at 29 and his hold was continued and he was transferred to the SD Human Services Center ("HSC") upon discharge. AR585. The diagnoses at transfer included major depressive disorder, anxiety disorder, rule-out bipolar disorder, narcotic dependence, opiate dependence, and B traits, provisional. AR585.

Mr. Whittle was admitted to the HSC involuntarily on January 12, 2007, and received in-patient treatment through February 20, 2007. AR342, 351. Mental status examination upon admission revealed Mr. Whittle to be very fidgety and anxious, mood dysphoric, and his insight and judgment were marginal, but otherwise the exam was normal. AR352. His psychomotor activity was within normal limits, he was coherent, logical, and goal-directed, and his mental grasp and cognitive ability showed he was oriented to person, place, and time. Id. Mr. Whittle's diagnoses at admission were narcotic dependence, bipolar disorder, and anxiety disorder with his GAF assessed at 25-30. AR352. The treatment notes relate that Mr. Whittle had received prior treatment at Keystone three times, once for a full treatment stay and twice for two weeks of detox. AR387. The treatment notes state Mr. Whittle's longest period of sobriety had been one month in the prior three years. AR394. The January 30, 2007, treatment note observes Mr. Whittle did not endorse any mental health symptoms, and it seemed apparent he was manipulating to leave the program early. Id. Personality disorder not otherwise specified with cluster

B traits were added to his diagnosis on February 6, 2007. AR395. The issue which led to Mr. Whittle's early discharge was a verbal altercation and documented physical aggression towards another peer, and it was recommended that he continue treatment at Keystone in their intensive outpatient program. AR411, 413. The HSC records documented that Mr. Whittle was receiving individual therapy from Gretchen Starnes at Volunteers of America, and his psychiatrist was Rajesh Singh, MD also at Volunteers of America.[3] AR353.

Mr. Whittle was seen at the Sanford Sycamore Clinic on February 21, 2007, complaining of pain related to his kidney stones and he was told to go to the hospital for a CT scan. AR1375. The nursing notes from the exam noted he was "very suspicious for drug seeking behavior". AR1375.

Mr. Whittle had some sort of encounter with the Sanford emergency room on February 27, 2007. AR1374.

Mr. Whittle was seen at the Avera emergency room on March 10, 2007, with complaints of palpitations, and had recently been discharged from the Human Services Center for drug rehab and psychiatric evaluation. AR557. He was somewhat anxious with flat affect, but no suicidal ideation was appreciated. AR558. Mr. Whittle was also alert, oriented, and in no respiratory distress. AR557. His strength and sensation of all extremities was intact. AR558.

---

[3] There are no treatment notes from Volunteers of America in the Appeal Record.  See AR Index.

Mr. Whittle had some sort of encounter with the Sanford emergency room on March 28, 2007. AR1374.

Mr. Whittle was seen at the Avera emergency room on March 30, 2007, for Percocet withdrawal symptoms and reported taking probably 100 pills over the prior 4 to 5 days, and he was trying to get back to Keystone. AR551.

Mr. Whittle had some sort of encounter with the Sanford emergency room on March 31, 2007. AR1373.

Mr. Whittle was seen at the Avera emergency room on April 28, 2007, complaining of right flank pain and an IV was given with Toradol and Zofran for pain and a CT revealed kidney stones, but without any obstructive pattern. AR543.

Mr. Whittle was seen at the Avera emergency room on May 14, 2007, for withdrawal symptoms and reported having a kidney stone and obtaining Vicodin in Dell Rapids. AR539.

Mr. Whittle was seen at the heart hospital emergency room on June 2, 2007, complaining of right flank pain, and he received Toradol and repeat doses of morphine. AR432.

Mr. Whittle was seen at the heart hospital emergency room on June 5, 2007, complaining of right flank pain, and he again received Toradol and repeat doses of morphine.  AR438.  The doctor noted Mr. Whittle had been seen at numerous emergency departments, including Deuel County Memorial Hospital recently.  AR439.

Mr. Whittle was seen at the Avera emergency room on June 5, 2007, complaining of right flank pain following a ureteral stent placement earlier that day, and despite taking Vicodin at home his pain continued.  AR523, 535.  Mr. Whittle was given Zofran, Toradol, and fentanyl for his pain, which alleviated his pain completely.  AR524.  He removed his own IV and left against medical advice when additional requests for narcotics were denied.  AR524.  Mr. Whittle returned to the ER the next day again complaining of pain, and was given 2 tablets of Vicodin and again removed his own IV and left the hospital.  AR519.

Mr. Whittle was seen at the heart hospital emergency room on June 7, 2007, complaining of right flank pain, but was sent to his urologist so was not examined or treated.  AR446.

Mr. Whittle was seen at the Avera emergency room on July 5, 2007, complaining of headache and requesting Toradol, which was given.  AR513.  On examination, Mr. Whittle's gait was normal, his cranial nerves and sensation were grossly intact, and he exhibited 5/5 strength in both the upper and lower extremities.  Id.  Mr. Whittle's serial neurological examinations were "completely intact" and he had "much improvement of his headache."  AR513.

Mr. Whittle was seen at the Avera emergency room on November 16, 2007, for Vicodin withdrawal symptoms and reported taking Vicodin the last 10 days.  AR508.  He was encouraged to follow-up to get a chemical dependency assessment and see if there were other treatment options available.  AR509.

Mr. Whittle was seen at the Sanford Brandon Clinic on January 8, 2008, for right flank pain and received Toradol, and then requested Ultram for pain relief and received a prescription for three pills after reporting that he had never abused Ultram in the past.  AR1372-73.

Mr. Whittle was seen at the emergency room on January 22, 2008, complaining of headache and was given Benadryl, Compazine and Toradol. AR504-05.  He was neurologically intact with appropriate mood, affect and judgment.  AR505.

Mr. Whittle was seen at the Sanford Luverne Hospital on February 21, 2008, for right flank pain.  AR1371.  A CT scan of his abdomen and pelvis revealed that bilateral kidney stones were present, but his ureters looked normal with no ureteral stone or sign of recent passage.  Id.  There was also no sign of appendicitis.  Id.

Mr. Whittle was seen at the Avera emergency room on March 4, 2008, complaining of a headache and was given Benadryl, Compazine, and Toradol, then pulled his own IV and left.  AR496-97.

Mr. Whittle was seen at the Avera emergency room on April 20, 2008, complaining of alcohol withdrawal symptoms and reported that he had not drank in 36 hours but usually consumed a large bottle of vodka daily. AR489. Mr. Whittle received an IV line and Ativan, which improved his symptoms. AR490. He said he planned to follow up with an outpatient alcohol detoxification program. AR490.

Mr. Whittle presented to the Avera behavioral health center on May 3, 2008, reporting a nervous breakdown and was admitted due to declining functional capacity and prevention of self-harm. AR473. He reported being overwhelmed with financial and legal problems and was in the 24/7 program which required to present to the courthouse twice a day to be breathalyzed. AR473. Mr. Whittle said that he was sleeping well and had good energy, and he denied any suicidal ideation. Id. Mental status exam revealed his mood was very anxious, affect was mood congruent, no evidence of psychosis, sensorium was clear, he was oriented times 3, his speech was logical and coherent, his memory and abstractive abilities were intact, his concentration was fair, insight was fair, and judgment very poor, and his GAF was assessed at 30. AR474-5. Mr. Whittle requested to leave, but agreed to stay when told they would file a hold on him because he was not safe to leave. AR473. Mr. Whittle's mood and anxiety improved and he requested discharge. AR471. He did not meet any of the hold criteria and was discharged on May 5, 2008. Id. He seemed hopeful and positive, but his long-term prognosis was somewhat guarded. Id.

Mr. Whittle was seen at the Avera emergency room on June 16, 2008, complaining of alcohol withdrawal symptoms and reported that he was at a break in his drinking. AR465.

Mr. Whittle was seen at the Avera emergency room on August 6, 2008, complaining of alcohol withdrawal symptoms and reported that he had not drank in 36 hours, but prior to that he had drank heavily for a month, finishing a 750 ml bottle of vodka over two-day periods. AR459.

Mr. Whittle was seen at the Sanford emergency room for alcohol withdrawal symptoms on August 11, 2008. AR1369.

Mr. Whittle was seen at the Sanford emergency room for alcohol withdrawal symptoms on July 19, 2009. AR1365. He said he had relapsed 3 weeks ago and his last drink was the night before. Id. On examination, his was alert and oriented, his speech, behavior, judgment, thought content, cognition, and memory were normal, he displayed mild tremors, and his mood was anxious. AR1367.

Mr. Whittle was seen at the Sanford 69th St Clinic for alcohol withdrawal symptoms on August 15, 2009. AR1363-64.

Mr. Whittle was seen at the Sanford 49th St. Clinic on October 27, 2009, for medication check for his depression and anxiety medications. The doctor noted he had not seen Mr. Whittle in a while and the last time Mr. Whittle had contaminated his urine sample with blood in order to get narcotic medication, and then ran out the door. AR1362.

The Sanford 49th St. Clinic was contacted on November 9, 2009, by the county jail because Mr. Whittle was short Xanax pills and they contacted the half-way house where he stayed and were told he was manipulating staff and taking more than he was supposed to. AR1360.

Mr. Whittle was seen at the Sanford 49th St. clinic on December 18, 2009, with problems sleeping, panic attacks, constant worry, and constant thoughts running through his head. AR1359. Mr. Whittle was in jail and would be there another four months. Id. His symptoms included depressed mood,

agitation, appetite change, anxiety, diminished interests and concentration, fatigue, insomnia and psychomotor retardation, and his mental status exam was normal. Id. His Remeron medication was discontinued and Ambien started. Id.

Mr. Whittle was seen at the Sanford 49th St. clinic on April 19, 2010, to discuss his medications and a tremor. AR1357-8. He had lost 50 pounds and appeared very anxious, tremulous, stressed and thin. AR1357. His medications were changed again. AR1358.

Mr. Whittle was seen at the Sanford 49th St. clinic on April 28, 2010, and wanted to change his medications again. AR1356. Mr. Whittle also admitted drinking some since being released from jail. AR1356.

Mr. Whittle was seen at the Sanford Hospital on May 11, 2010, due to problems with alcohol. AR1354. He reported he had been drinking daily since being released from jail, and was now having right flank pain, and he reported being agitated and had a slightly anxious affect. AR1354-55.

Mr. Whittle contacted the Sanford 49th St. clinic on May 26, 2010, and was at the county detox center and reported he was "going crazy" and needed something stronger for his anxiety. AR1354. The exam record stated, "Informed pt. that Dr. Meyer is out until next week and that he should have staff bring him to ER for immediate evaluation." Id.

Mr. Whittle contacted the Sanford 49th St. clinic again on June 1, 2010, and was still in detox and again requested something for his anxiety as well as

something to help with sleep. AR1353. Dr. Meyer was not willing to increase Mr. Whittle's Clonazepam dosage. Id.

Mr. Whittle contacted the Sanford 49th St. clinic on June 22, 2010, and reported he had been kicked out of a treatment facility in Mitchell[4] for smuggling in alcohol and was back at the county detox center. AR1352. He said he went crazy in Mitchell and felt like he was going to murder someone and needed something more than clonazepam for his anxiety, and his dosage was doubled. Id.

Mr. Whittle contacted the Sanford 49th St. clinic on June 25, 2010, and requested an early refill of his clonazepam because he had taken more than the prescribed amount while in the detox center. Id. Dr. Meyer informed Mr. Whittle it was too early to refill his prescription. AR1352.

Mr. Whittle was seen at the Sanford emergency room on August 7, 2010, for head and tooth pain and reported he had a seizure and hit his head, and had staples placed but they were removed for an MRI. AR1349. He also reported taking 45mg of Klonopin to sleep the prior Monday, (prescribed dose was .5 to 1.0mg- AR1352), and 45 mg of Librium the prior night. Id. The treatment note indicates he was in a treatment facility in Yankton[5] the prior week. AR1349. Mr. Whittle admitted occasional abuse of his benzodiazepines, and was requesting pain medication. AR1350. On examination, he was alert,

---

[4] There are no treatment records in the Appeal Record from a Mitchell treatment facility.  See AR Index.

[5] There are no treatment notes from HSC or any other Yankton treatment facility around that time in the Appeal Record.  See AR Index.

his speech was clear and fluent, his neurological examination was nonfocal, and he was unkempt and had very poor hygiene. Id. He was treated with saline and sent to the mission for the night. Id. He was encouraged to discontinue abuse of drugs and alcohol. Id.

Mr. Whittle contacted the Sanford 49th St. clinic on August 11, 2010, and requested a refill of his Clonazepam and an increased dosage due to panic attacks. AR1349.

Mr. Whittle was seen at the Sanford 49th St. clinic on August 16, 2010, following his hospitalization for an overdose and depression. AR1348. He reported he had been kicked out of his dad's house and had overdosed on the Klonopin recently prescribed. AR1348. He was observed to look thin, anxious, frustrated and tremulous. Id. Mr. Whittle's antidepressants were refilled but he was not given benzodiazepine. Id. Dr. Meyer was not convinced that Mr. Whittle was committed to living a clean lifestyle and he encouraged him to get a job. Id.

Mr. Whittle was brought to the Sanford emergency room via ambulance on August 18, 2010, and he had been living at the mission and drinking ½ gallon of alcohol daily. AR1345. Mr. Whittle said that he saw his primary doctor 2 days ago and had neglected to tell him that he was drinking heavily again. Id. On examination, he was oriented and in no distress and his mood, affect, behavior, judgment, and thought content were normal. AR1346. He was treated with saline and Zofran.  Because there was no room at the detox facility and no family member to take him, he was sent by cab back to the mission. AR1347-48.

Mr. Whittle was seen at the Sanford emergency room on September 9, 2010, and reported having taken all of his meds, drank a bunch of alcohol and overdosed, and he was placed on a hold and admitted to ICU. AR1338, 1341. He reported feeling somewhat suicidal. AR1339. Examination revealed slurred speech, impulsivity, depressed mood and suicidal ideation. AR1340.

Mr. Whittle was oriented and in no distress and his cognition and memory were normal. Id. The treatment notes discuss a prior involuntary hold in July 2010, initially at Avera McKennan Behavioral Health and then being transferred to the HSC in Yankton where he spent 25 days before being discharged on August 2, 2010[6]. The records indicate Mr. Whittle switched his addiction from Percocet to alcohol in 2007, and he reported attempting suicide several times in the past six months. AR1342. Mr. Whittle's hold was continued, and he was transferred by deputy to the HSC in Yankton on September 10, 2010[7]. AR1343. Dr. Meyer, Mr. Whittle's treating physician from the Sanford 49th St. clinic, examined him while he was in the hospital and stated Mr. Whittle appeared medically stable at that point and he believed Mr. Whittle needed inpatient treatment for depression, drug addiction and alcoholism with possible long-term inpatient treatment. AR1345.

---

[6] There are no records or record requests for the Yankton Human Services Center for any committals during 2010 in the appeal record. There is a record request sent to Avera on June 14, 2016, requesting records from 09/2007 through present, but there are no Avera records in the Appeal Record from September 2008 through September 2014. AR Index 3-4, 1790.

[7] The HSC records related to this transfer and subsequent treatment in September, 2010, do not appear in the Appeal Record. See AR Index 3-4.

The records from Sanford 49th St. clinic state on September 15, 2010, that "Records received from Yankton Human Services center." AR1338. Mr. Whittle was seen at the Sanford 49th St. clinic on September 16, 2010, and the Subjective section of the exam note states Mr. Whittle was seen for follow-up from hospitalization, "He was hospitalized 1 week ago for alcoholism and depression at Yankton." AR1337.

Mr. Whittle was brought to the Sanford emergency room on December 13, 2010, complaining of pain which started when his medications were withdrawn that morning at HSC where he was released after four days of treatment.[8] AR1335. He reported being suicidal and overdosing on his meds while at HSC. Id. On examination, his mood, affect, behavior, judgment, and thought content were normal. AR 1336. He denied suicidal and self-injury ideas in his review of symptoms. Id.

Mr. Whittle was seen at the Sanford emergency room on December 27, 2010, with jitteriness, nausea and not feeling well. AR1333. Mr. Whittle reported sleep disturbance, dysphoric mood, and was nervous/anxious, but not suicidal. AR1334. He was treated with saline, Ativan, and thiamine and given enough medication to last until his appointment at Falls Community Health the next Wednesday, and the note also stated he had established care at the Fifth Street Connection and was to see a psychiatrist. AR1333-34.

---

[8] There are no records from HSC in the appeal record for any treatment in December, 2010.  See AR Index 3-4.

Mr. Whittle was brought to the Sanford emergency room via ambulance on February 8, 2011, after consuming two pitchers of beer and 750ml of vodka. AR1328. He was discharged on an alcohol hold to detox. AR1329.

Mr. Whittle was seen at the Sanford emergency room on April 23, 2011, for alcohol withdrawal symptoms and reported drinking about a case of beer daily for the past three weeks since he got off the 24/7 program. AR1326.

Mr. Whittle was brought to the Sanford emergency room via ambulance on April 30, 2011, for alcohol withdrawal symptoms and reported drinking a 750ml of vodka or tequila daily, and had gotten off the 24/7 program four weeks earlier, but drank the whole time he was in the program stating it was easy to cheat the program. AR1318, 1322. He was found to be tachycardic in the 120s, and was treated and discharged home with instructions to contact Falls Community Health the next morning. AR1322.

Mr. Whittle was seen at the Sanford emergency room on May 5, 2011, for alcohol withdrawal and reported he had gone back to drinking following his discharge four days earlier. AR1317.

Mr. Whittle was seen at the Sanford emergency room on May 9, 2011, for alcohol withdrawal and reported shakes, body aches and nausea without resolution after trying a few drinks. AR1315. Mr. Whittle was intoxicated and the detox center was full, but Mr. Whittle stated he could stay with his father, but then left prior to being discharged. AR1317.

Mr. Whittle was seen at the Sanford emergency room on May 9, 2011, for alcohol withdrawal symptoms and he again reported a 26-day inpatient

treatment at Yankton the prior August. AR1312. Mr. Whittle was seen again on May 14, 2011, and reported that he had been to the detox center multiple times, but always left after a few hours. Id. On examination, his speech, cognition, and memory were normal. AR1313. The detox center was full, and Mr. Whittle removed his own IV and left before treatment was completed. AR1314.

Mr. Whittle was seen at the Sanford emergency room on May 28, 2011, for alcohol withdrawal symptoms and abdominal pain. AR1310. He received treatment from 9:51 that evening until the following morning at 6:27 then left on his own. AR1312.

Mr. Whittle was seen at the Sanford emergency room on June 14, 2011, for ulcers and reported that he had not drank for two weeks. AR1308.

Mr. Whittle was seen at the Sanford emergency room on June 21, 2011, for a migraine and alcohol withdrawal symptoms and reported he was drinking again. AR1307. He appeared healthy, alert, and cooperative and his neurological examination did not reveal any focal findings. AR1308. His mental status and speech were normal and he was fully oriented. Id. Mr. Whittle reported that he was not sure he wanted to quit drinking. Id.

Mr. Whittle was seen at the Sanford emergency room on August 3, 2011, for a migraine and alcohol withdrawal symptoms and reported drinking a six pack of alcohol daily. AR1304. His speech and behavior were normal and he expressed no suicidal ideation. AR1305.

Mr. Whittle was seen at the Sanford emergency room on August 16, 2011, for alcohol withdrawal symptoms. AR1303.

Mr. Whittle was seen at the Sanford emergency room on August 26, 2011, for abdominal pain and vomiting, and received Toradol, Lorazepam, and Zofran. AR1300-02.

Mr. Whittle was seen at the Sanford emergency room on August 27, 2011, for abdominal pain and reported he had not drank in a week, but was seen again on September 2, 2011, for vomiting and reported being unable to hold down fluids including water, but had been able to hold down a few beers. AR1297, 1299.

Mr. Whittle was seen at the Sanford emergency room on September 9, 2011, for alcohol withdrawal symptoms, and reported drinking daily with symptoms starting when his neighbor cut him off alcohol. AR1295.

Mr. Whittle was seen at the Sanford emergency room on September 22, 2011, for flank pain, and presented with alcohol on his breath and left before any tests could be performed. AR1293-94.

Mr. Whittle was seen at the Sanford emergency room on September 25, 2011, for alcohol withdrawal symptoms. AR1292. He was alert and oriented, his speech was normal, and he denied suicidal ideation. Id.

Mr. Whittle was seen at the Sanford emergency room on October 2, 2011, for alcohol withdrawal symptoms. He reported usually drinking four 24oz beers and 2-3 shots of rum at one sitting. AR1289. The subjective portion of the exam note stated that Mr. Whittle had been in treatment twice this year

already at Keystone and Yankton.[9] AR1290. Mr. Whittle was noted to be on a daily dose of 20 mg valium and was cautioned about combining benzodiazepines and instructed that any further BZD prescriptions needed to come from Dr. Fuller with psychiatry.[10] AR1291.

Mr. Whittle was seen at the Sanford emergency room on October 7, 2011, for anxiety that felt like a panic attack, nausea, tremors and alcohol withdrawal, and after treatment was started he wanted to leave but his blood alcohol level was too high to allow an "against medical advice" release. Security found him in the parking lot and returned him for treatment until his blood alcohol level declined. AR1287-89. Examination revealed he was alert and oriented with normal motor and sensory function and no focal deficits. AR1289.

Mr. Whittle was seen at the Sanford emergency room on October 14, 2011, for alcohol withdrawal symptoms. AR1284. His mood, affect, speech, behavior, thought content, cognition, and memory were normal. AR1285.

Mr. Whittle was seen at the Sanford emergency room on November 4, 2011, twice for alcohol withdrawal symptoms, once in the morning and once in the evening. AR1281-2. Mr. Whittle's morning examination revealed a normal mood and affect. AR1283.

---

[9] There are no treatment notes from Keystone or Yankton HSC in the appeal record for the year 2011. See AR Index.

[10] There are no psychiatric treatment notes in the appeal record from Dr. Fuller or any other psychiatrist in 2011. See AR Index.

Mr. Whittle was seen at the Sanford emergency room on November 5, 2011, for alcohol withdrawal symptoms. AR1280.

Mr. Whittle was seen at the Sanford emergency room on November 17, 2011, for alcohol withdrawal symptoms, and reported that his neighbor supplies him with alcohol, but when his neighbor runs out of money he starts having withdrawal symptoms. AR1278-80.

Mr. Whittle was seen at the Sanford emergency room on November 24, 2011, for alcohol withdrawal symptoms. AR1276.

Mr. Whittle was seen at the Sanford emergency room on December 3, 2011, for alcohol withdrawal symptoms, including vomiting blood, and he reported he had stopped drinking, but when confronted about the smell of alcohol he admitted to drinking two beers to help with withdrawal. AR1274.

Mr. Whittle was seen at the Sanford emergency room on December 14, 2011, for alcohol withdrawal symptoms. AR1273. The treatment note stated he had been to the emergency room 30 times this year and he was not given an Ativan starter pack this time and was told to talk to his case manager and encouraged to follow up with Falls Community Health.[11] AR1274.

Mr. Whittle was seen at the Sanford emergency room on December 21, 2011, for alcohol withdrawal symptoms. AR1271. He was assessed with dehydration and some withdrawal symptoms, though his sensorium was intact. AR1273.

---

[11] There are no treatment notes from a case manager of Falls Community Health before August, 2014, in the appeal record.  See AR Index.

Mr. Whittle was seen at the Sanford emergency room on January 7, 2012, for abdominal pain and had been drinking. AR1269.

Mr. Whittle was seen at the Sanford emergency room on January 8, 2012, for alcohol withdrawal symptoms. AR1267.

Mr. Whittle was seen at the Sanford emergency room on February 4, 2012, for chest pain and anxiety, and alcohol withdrawal symptoms. AR1263.

Mr. Whittle was seen at the Sanford emergency room on February 17, 2012, for alcohol withdrawal symptoms. AR1262. Examination revealed he was alert and oriented to time, place, and person, he answered questions appropriately, he appeared intoxicated, and he smelled of alcohol. Id. Mr. Whittle left prior to completion of ETOH hold and transfer. Id.

Mr. Whittle was seen at the Sanford emergency room on March 18, 2012, for alcohol abdominal pain. Id. He reported that his psychiatrist would no longer prescribe his non-psychiatric medications and he hadn't made it in to "CHC" to obtain them.[12] AR1261. He was alert and fully oriented and his mood and affect were normal. AR1262. His abdominal examination revealed no tenderness. Id.

Mr. Whittle was seen at the Sanford emergency room on April 3, 2012, for abdominal pain, and he reported that he obtains his psychiatric medications from "Fifth Street Connection" but they would not refill his

---

[12] There are no psychiatric treatment records in the file for 2012 or any treatment records from "CHC" in 2012. See AR Index.

Nexium, and he was advised to get a prescription at Falls Community Health.[13] AR1260.

Mr. Whittle was seen at the Sanford emergency room on May 16, 2012, for abdominal pain and requesting Nexium because the "lady" at "FCH" was on vacation. AR1256. He reported he had not drank in a week. Id. His abdomen was soft with epigastric tenderness, but no guarding, mass, rebound, or CVA tenderness. AR1257. He was seen again on May 23, 2012, with the same symptoms and again reported he had not drank in a week. AR1253.

Mr. Whittle had similar emergency room visits for abdominal pain on May 24, 2012 and May 31, 2012. AR1250-51. At both visits, he reported he had been drinking beer. Id.

Mr. Whittle was seen at the Sanford emergency room on August 23, 2012, for alcohol withdrawal symptoms, and reported drinking daily, but had stopped 28 hours earlier. AR1248.

Mr. Whittle was seen at the Sanford emergency room on September 12, 2012, for abdominal pain symptoms and reported that he had been drinking for two weeks but had been sober for four months before that. AR1246.

Mr. Whittle was seen at the Sanford emergency room on September 19, 2012, for alcohol withdrawal symptoms. AR1245. He said his last drink was the day before. AR1245.

---

[13] There are no treatment records from 2012 for "Fifth Street Connection" or Falls Community Health in the appeal record. See AR Index.

Mr. Whittle was seen at the Sanford emergency room on September 24, 2012; October 8, 2012; and November 25, 2012, for alcohol withdrawal symptoms. AR1240, 1242, 1244. At the September 24, 2012, visit Mr. Whittle reported he continued to drink. AR1244. On November 25, 2012, he said he had been drinking heavily for the last 10 days. AR1240.

Mr. Whittle contacted the Sanford 49th St. clinic on February 25, 2013, requesting Ambien, and reported he was a patient at Southeastern Behavioral Health.[14] AR1239.

Mr. Whittle was seen at the Sanford emergency room on March 23, 2013, for tooth pain and reported he had not drank since November and he really liked his new counselor at SE Behavioral Health. AR1238.

Mr. Whittle contacted the Sanford 49th St. clinic on May 17, 2013, for alcohol withdrawal symptoms and reported he had been drinking for 10 days. His last drink had been the prior day around 6:00 a.m.; his blood alcohol level was still .039 percent 33 hours later, and the emergency room was contacted for transfer by ambulance with direct admission to detox. He was treated in the emergency room and released. AR1233, 1234, 1236.

Mr. Whittle was seen at the Sanford emergency room on August 28, 2013, for right flank pain and treated with Toradol and morphine. He was given a prescription for Norco, an opioid. AR1227-28.

---

[14] There are no treatment records in the appeal record from Southwestern Behavioral Health before August 2014. See AR Index.

Mr. Whittle was seen at the Sanford emergency room on November 3, 2013, for a migraine headache, and was concerned he had an alcohol withdrawal seizure because he has stopped drinking three days earlier. The treatment notes observed he visited the emergency department frequently for headaches and anxiety. AR1222-4. Mr. Whittle's speech and behavior were normal and he was noted to be tachycardic but had no tremulousness or hypertension to suggest alcohol withdrawal. AR1224.

Mr. Whittle was seen at the Sanford emergency room on February 7, 2014, with ongoing tooth pain. AR1217. He reported the pain causes headaches and is improved with Norco which he had been out of since February 4, 2014. Id.

Mr. Whittle was seen at the Sanford emergency room on April 30, 2014, arriving by ambulance for a sprained ankle. He reported he continued to drink alcohol. AR1212-13. He was discharged, but tests later showed he had a broken bone. He was contacted on May 1, 2014, to return to the emergency room where he was given a prescription for Norco for pain. AR1210-11. When seen in the orthopedic clinic on May 2, 2014, he requested more pain medication, and was given a prescription for Norco. AR1209.

Mr. Whittle was seen at the Sanford Sycamore clinic on May 13, 2014, for right foot pain and reported the hydrocodone he was given did not help because having been addicted to it he needed more to help his pain, but additional hydrocodone was refused. AR1208.

Mr. Whittle contacted the orthopedic clinic on May 14, 2014, and requested more hydrocodone which was refused. Id.

Mr. Whittle was seen at the orthopedic clinic on May 16, 2014, for ankle pain and was tearful, disheveled and unkempt. AR1204. On examination, he was able to dorsiflex and plantar flex his ankle through a range of motion symmetric to the contralateral side. AR1205. He had no pain with palpation over his ankle joint. AR1205. He specifically requested hydrocodone, which was refused. AR1205. Mr. Whittle then went to the Sanford emergency room again requesting pain medications and was refused. AR1202-04.

Mr. Whittle was seen at the Sanford emergency room on July 26, 2014, for a migraine headache and caffeine withdrawal symptoms. AR1200-01.

Mr. Whittle was admitted voluntarily to Avera Behavioral Health on October 24, 2014, due to worsening anxiety and panic attacks. AR874. He reported having daily panic attacks with a racing heart, sweating, muscle cramping, shortness of breath, and a feeling of impending doom. Id. Mr. Whittle also endorsed feeling anxious meeting new people or being in public places. Id. The treatment note documented multiple prior hospitalizations with his most recent admission at Avera Behavioral Health in March, 2014, for depression and anxiety.[15] Id. Mr. Whittle's current medications included Abilify, Celexa, Klonopin, Nexium, Remeron, Seroquel,

---

[15] The Appeal Record does not include any treatment records from an admission at Avera Behavioral Health in March, 2014. See AR Index. There is a record request dated December 1, 2015, from the state agency requesting records from Avera Behavioral Health from September, 2015 to present. AR1032.

and Ambien. Id. His mental status exam was normal except fair attention span, judgment and insight. AR877. His psychiatric diagnoses were unspecified anxiety disorder with panic features, major depressive disorder without psychosis, alcohol and opioid use disorder in remission, unspecified personality disorder with borderline and antisocial traits and a differential diagnosis of social anxiety disorder. AR878. Mr. Whittle was discharged on October 25, 2014, with his Seroquel dosage increased, and Klonopin decreased to taper off and switch to Ativan for anxiety. AR872.

Mr. Whittle contacted the Sanford 49th St. clinic on November 21, 2014, and again on November 26, 2014, seeking help with management of his psychiatric medications because he was frustrated with the constant turnover of the residents who treat him at Southeastern Behavioral Health. AR1195-96.

Mr. Whittle was seen at the Avera emergency room on January 22, 2015, for abdominal pain. AR860. A CT scan was obtained and multiple doses of IV narcotics were given. AR861. At re-evaluation, Mr. Whittle said his pain had almost completely resolved since arrival in the emergency room. His provider stated, "I discussed with him that it was possible that he could have passed a kidney stone since arrival which would explain his pain as well as marked improvement in the pain at this time." Id.

Mr. Whittle was seen at the Avera emergency room on March 16, 2015, for right flank pain and appeared quite anxious, but otherwise did not seem to be in considerable distress. AR850. He received pain medications and fluids

while in the emergency room.  AR852.  His CT scan and lab results were "quite unremarkable" and he was not provided with narcotics to take home.  Id.

Mr. Whittle was seen at the Avera emergency room on March 21, 2015, requesting a mental health evaluation and reported that medication changes a couple of weeks earlier had not helped with his mental health symptoms and he had resorted to alcohol to try to calm himself and had been binging on a bottle of vodka daily, and was having withdrawal symptoms.  AR844.  On examination, Mr. Whittle's mood and affect were fairly normal, his reasoning appeared appropriate, and he did appear somewhat unkempt.  AR845. Mr. Whittle was found stable and released to go to Avera Behavioral Health's Assessment Center.  Id.  He was seen in Assessment and his Ambien dosage was increased.  AR842.  At the assessment, Mr. Whittle looked "quite good" and he was smiling, engaging and calm.  Id.  He did not appear anxious or downcast.  Id.

Mr. Whittle was seen at the Avera emergency room on April 20, 2015, for right flank pain.  AR833.  An ultrasound of his right kidney was normal and his abdomen examination was benign.  AR834.  He was given tramadol a narcotic pain medication and Toradol in the emergency room, but he was not given a prescription.  Id.

Mr. Whittle was seen at the Avera emergency room on May 12, 2015, for abdominal pain and given morphine, Toradol and Zofran.  AR823-24.

Mr. Whittle was seen at the Sanford emergency room on June 18, 2015, for a migraine headache. AR1186. His mood, affect, behavior and neurological examination were normal. AR1187.

Mr. Whittle was seen at the Avera emergency room on June 19, 2015, for alcohol withdrawal symptoms and reported drinking heavily the last three weeks and being quite depressed and anxious. AR816. He was treated with Ativan, a benzodiazepine, and also given a short course of Ativan. AR817.

Mr. Whittle was seen at the Avera emergency room on July 27, 2015, for right flank pain. AR806. Analgesics and fluids were given. AR807.

Mr. Whittle was seen at the Avera Heart Hospital emergency room on August 7, 2015, for alcohol withdrawal symptoms. AR889. He stated he wanted to go to Behavioral Health, but EMS had brought him into the ER. Mr. Whittle reported drinking daily and feeling anxious and irritable, and was requesting Ativan. Id. He was given Ativan and fluids and discharged to detox. AR890. Mr. Whittle's lab studies were "essentially unremarkable" and the emergency room provider noted concerns regarding what appeared to be a history of benzodiazepine abuse. Id.

Mr. Whittle was seen at the Avera emergency room on September 3, 2015, for a migraine and toothache. AR1014.

Mr. Whittle was seen at the Avera emergency room on September 9, 2015, and he had made multiple superficial cuts on his wrists and forearm with a razor. AR996. He reported it was not a true suicide attempt, but just to hurt himself because it makes him feel a little better. Id. Mr. Whittle reported

36

being depressed and sad but not suicidal.  Id.  At admission his hygiene and grooming were poor.  AR993.  On examination, he was awake alert, appropriate, oriented, pleasant, and cooperative.  AR996.  He was voluntarily admitted to Avera Behavioral Health where he reported he was stressed because his anxiety was "sky high."  AR993.  An examination revealed that his mood was euthymic, his affect was congruent, his speech was normal, his thought processes were coherent and linear, and his attention and concentration were fair.  Id.  At discharge, his mood was happy and his psychomotor activity was normal.  AR994.  Seroquel was stopped, Zyprexa started and his Klonopin dosage was increased.  Id.

Mr. Whittle was seen at the Sanford emergency room on October 13, 2015, arriving by ambulance for a migraine, which he described as a chronic migraine.  AR1180-81.  He was alert and oriented with no cranial nerve or sensory deficit.  AR1182.  His speech, mood, and affect were normal.  Id.

Mr. Whittle was seen at the Avera emergency room on October 26, 2015, for abdominal pain and a little bit of right flank pain.  AR1057.  His abdominal examination was benign.  AR1058.

Mr. Whittle was seen at the Sanford emergency room on November 25, 2015, arriving by ambulance for tremors and anxiety.  AR1175.  He reported tremors were worse and said he had not had alcohol in the last three months.  AR1176.  He said that his psychiatric symptoms were controlled with medication.  Id.  His examination revealed a mild coarse tremor and normal coordination and muscle tone.  Id.

Mr. Whittle was admitted to the Avera Behavioral Health Center on transfer from the Avera Heart Hospital ER where a hold had been placed due to superficial cutting on his arms on November 28, 2015. AR1046, 1048. He was intoxicated and was treated for withdrawal symptoms and discharged on November 30, 2015. AR1048. Mr. Whittle reported increased depression the last month with some anhedonia, feeling of hopelessness, decreased energy level, chronic sleep problems, and anxiety better than previous, but he had a panic attack that day. AR1051. The treatment record notes five prior suicide attempts five years ago. Id. Mental status exam revealed tearfulness, poor grooming and hygiene, unkempt, flaky skin, fair eye contact, depressed and anxious mood, fair attention and concentration, poor insight and judgment. AR1053. Mr. Whittle's eye contact was fair, his speech was clear and non-pressured, his psychomotor activity was normal, his thought processes were logical and coherent, and he had no memory deficits. Id.

Mr. Whittle was seen at the Sanford emergency room on December 7, 2015, arriving by ambulance for shaking and a headache. AR1172-73. On examination, he had a mild tremor, but his gross motor examination was normal by observation and he was able to follow commands and answer questions appropriately. AR1174. His laboratory results were "essentially unremarkable." AR1175. Mr. Whittle's tremor improved and his headache completely resolved with medication. Id.

Mr. Whittle was seen at the Sanford emergency room on December 9, 2015, arriving by ambulance for shaking, muscle aches, headache, and other

symptoms he said felt like alcohol withdrawal, but said he had not had any alcohol in over three months.  AR1170.  He was concerned about "post-alcohol seizures."  Id.  The emergency room provider assessed that Mr. Whittle's headaches were likely exacerbated by a viral illness and mild dehydration.  AR1172.  His shaking improved with Ativan.  Id.

Mr. Whittle was seen at the Sanford emergency room on December 24, 2015, for a migraine.  AR1163.  His neurological examination and mood, affect, behavior, judgment, and thought content were normal.  AR1165.

Mr. Whittle was seen at the Sanford emergency room on January 7, 2016, arriving by ambulance for alcohol withdrawal symptoms, reporting he had been drinking daily since Christmas.  AR1159-60.  Mr. Whittle reported that he had been seen several times in December, 2015, with similar symptoms of body ache, shaking, nausea, and vomiting.  AR1161.

Mr. Whittle was brought by law enforcement to Avera Behavioral Health and admitted on January 20, 2016, for prevention of self-harm.  AR1817.  He complained his anxiety made him drink.  Id.  Mr. Whittle reported increased depression and hopeless thoughts, loss of interest, isolating, decreased energy, increased anxiety, and panic attacks, which led to alcohol relapse.  AR1818.  On examination, Mr. Whittle's eye contact was appropriate, he was cooperative and pleasant, his thoughts were logical and goal-directed, his concentration and recent and remote memory were intact, his abstract ability was fair, he had mildly disheveled hygiene, his mood was anxious and depressed with neutral affect, and he had poor judgment and insight.  AR1819-20.  His

Zyprexa and Remeron medication dosages were increased and he was discharged on January 22, 2016.  AR1821.

Mr. Whittle was seen at the Sanford emergency room on February 6, 2016, arriving by ambulance for alcohol withdrawal symptoms and headache, and reporting he had been drinking daily since his birthday. AR1156-57. Mr. Whittle's urinalysis was consistent with dehydration. AR1159.  He did not appear to be in acute severe alcohol withdrawal or delirium tremens, thus further workup or admission was unnecessary.  AR1160.

Mr. Whittle was seen at the Sanford emergency room on February 20, 2016, for alcohol withdrawal symptoms and headache, and reported drinking more often.  AR1873-74.  The emergency room providers assessed that Mr. Whittle presented as though he had been drinking alcohol, he was not belligerent or uncooperative.  AR1879.  He was quite calm and cooperative, he was not shaking, and he did not exhibit tremors.  Id.  He appeared clinically sober and not withdrawing.  Id.

Mr. Whittle was voluntarily admitted to Avera Behavioral Health on March 30, 2016, for prevention of self-harm.  AR1798.  He reported that his apartment was very dirty and extremely filthy and he was stressed over a home inspection coming up soon, and he didn't feel safe if he returned home.  Id. Apart from being stressed about his dirty apartment, Mr. Whittle said he was doing pretty well.  Id.  His eye contact was good, his mood was euthymic, his thought processes were concrete and coherent, and his attention, concentration, insight and judgment were fair.  AR1801.

Mr. Whittle's diagnoses were borderline personality disorder, panic disorder, alcohol use disorder, and depressive disorder in partial remission. Id. He was discharged on March 31, 2016, and had an appointment scheduled for an assessment at Keystone on April 4, 2016. AR1806.

Mr. Whittle was seen at the Sanford emergency room on May 2, 2016, for a migraine. AR1892.

Mr. Whittle was seen at the Sanford emergency room on May 14, 2016, for a migraine. AR1898. He said that his headaches were usually controlled with Excedrin but he came to the emergency room because he ran out. AR1900.

Mr. Whittle was seen at the Sanford emergency room on May 16, 2016, for a migraine. AR1903.

Mr. Whittle was seen at the Sanford emergency room on May 26, 2016, for a migraine. AR1911.

Mr. Whittle was seen at the Sanford emergency room on June 25, 2016, for a migraine. AR1943.

Mr. Whittle was seen at the Sanford emergency room on July 25, 2016, for a migraine. AR1951.

Mr. Whittle was seen at the Sanford emergency room on September 9, 2016, for a migraine, and reported daily headaches, but not one that severe for a month. On examination, he had no focal neurological deficits. AR1959. He was treated with a GI cocktail but his headache persisted and he was given Nubain, a narcotic pain medication. AR1955, 1960.

Mr. Whittle was seen at the Sanford emergency room on September 14, 2016, for a migraine.  AR1969.  His neurological examination was normal and the emergency room provider noted that Mr. Whittle was well known for his frequent visits and drug seeking behavior.  AR1970.  He requested opiate pain medication and the provider explained to him that headaches are not typically treated with opiates.  Id.

Mr. Whittle was seen at the Sanford emergency room on October 2, 2016, complaining of anxiety/panic.  AR1973.  He reported not drinking for the past seven months, feeling nervous and shaky.  Id.  Mr. Whittle was found to be mildly tachycardic which improved with treatment. AR1975.

Mr. Whittle was seen at the Sanford emergency room on October 26, 2016, complaining of being nervous/anxious and reported being out of Klonopin and that his house was very dirty and the prospect of cleaning it significantly increased his anxiety.  AR1978-79.  On examination, Mr. Whittle's mood, affect, behavior, judgment, and thought content were normal.  AR1980.  He was given Vistaril, but his request to refill his Klonopin was denied.  Id.

Mr. Whittle was seen at the Sanford emergency room on October 29, 2016, complaining of anxiety.  AR1983.  He said he never filled his Vistaril prescription "because medication does not work for him."  Id.  He did not appear anxious on examination and did not exhibit any tremors.  AR1985.

Mr. Whittle was seen at the Sanford emergency room on January 14, 2017, for a migraine.  AR1991.  He said he had been sober for seven months, but had a couple of shots a couple of days ago.  AR1993.

Mr. Whittle was seen at the Sanford emergency room on January 29, 2017, for a migraine and abdominal pain.  AR1998.

Mr. Whittle was seen at the Sanford emergency room on February 4, 2017, for complaints of withdrawal symptoms and was requesting benzodiazepines, and also reported chronic body pain all over his body and feeling very anxious.  AR2004.  Mr. Whittle was told that in the future when he wants help with his benzodiazepine addiction he should contact Avera Behavioral Health.  AR2008.

Mr. Whittle was seen at the Sanford emergency room on February 15, 2017, for a migraine, nausea and diarrhea.  AR2011.

Mr. Whittle was seen at the Sanford emergency room on March 28, 2017, for alcohol withdrawal symptoms and reported consuming a quart of vodka the prior day.  AR2041.  His assessment was alcohol intoxication without withdrawal.  AR2043. He was offered discharge to a detox program, but declined.  Id.

Mr. Whittle was seen at the Sanford Hospital on April 3, 2017, and his gallbladder was surgically removed due to symptomatic cholelithiasis.  AR2056.

Mr. Whittle was seen at the Sanford emergency room on April 9, 2017, complaining of abdominal pain following his gallbladder surgery and reported being out of his pain medications.  AR2062.  He was given Percocet in the ER, but no additional prescription for narcotics.  AR2064.

Mr. Whittle was seen at the Sanford emergency room on April 15, 2017, for a migraine.  AR2085.

Mr. Whittle was seen at the Sanford emergency room on May 3, 2017, for a migraine. AR2094. His neurological examination was non-focal. AR2089. The nursing staff attempted to reevaluate Mr. Whittle, but he took his IV out and left after administration of medication. Id.

Mr. Whittle was seen at the Sanford emergency room on May 15, 2017, for a migraine, and reported using shots of vodka in an attempt to relieve his headache before coming to the ER. AR2100.

Mr. Whittle was seen at the Sanford emergency room on June 4, 2017, for a migraine. AR2107.

Mr. Whittle was seen at the Sanford emergency room on June 22, 2017, for alcohol withdrawal symptoms and reported drinking a bottle of vodka daily for the last two weeks due to increased depression. AR2122.

Mr. Whittle was seen at the Sanford emergency room on August 5, 2017, for abdominal pain and the treatment note indicated he had received 17 prior CTs or CT scans of his abdomen without finding hydronephrosis or ureteral stone. AR2200. Another CT was ordered but Mr. Whittle left after the CT, and the treatment note indicated concern that Mr. Whittle had contaminated his urine sample to manipulate his care. AR2200.

Mr. Whittle was seen at the Sanford emergency room on September 4, 2017, for a migraine. AR2208. He reported getting 5-10 migraines per month, but normally gets good relief with Imitrex, but it had not worked all day. AR2208. Mr. Whittle was fully oriented with no cranial nerves deficits. AR2212. Mr. Whittle left the hospital before receiving any treatment. Id.

Mr. Whittle was seen at the Sanford emergency room on September 15, 2017, for anxiety.  AR2216. He reported having an anxiety attack with fast breathing and chest pressure.  Id.  On examination, he appeared anxious and his mood, affect and speech were normal.  AR2219.  Mr. Whittle's anxiety resolved in the emergency room with Zofran.  AR2220.

Mr. Whittle was seen at the Sanford emergency room on September 19, 2017, arriving by ambulance to obtain a Nexium pill due to sharp pain.  AR2226.

### 2. Southeastern Behavioral Health (psychiatric records):

Southeastern Behavioral Health treatment records were requested by the state agency beginning in August, 2014.  AR900.

The first psychiatric treatment record with Southeastern Behavioral Health in the appeal file was for an appointment on December 1, 2014. However, that treatment note stated that Mr. Whittle had been seen on March 24, 2014, when his Effexor dosage was increased, and again on September 15, 2014, when his medications were left unchanged: taking two antipsychotics and three sleep aids, but the full exam notes do not appear in the appeal record.  AR906.  Mr. Whittle was seen on December 1, 2014, and reported doing well except for a neighbor who was harassing him and he had been hospitalized briefly for panic attacks a few weeks earlier.  AR907.  He said he is generally able to function throughout the day and was not sure why his panic attacks happen.  Id.  He said the panic attacks had "not really been happening since he was placed on Ativan."  Id.  He said his anxiety was generally well

45

controlled.  Id.  Mr. Whittle said that he recently went to a concert with 12,000 people and did not feel overly anxious.  He continued to socialize with a neighbor and had dinner with his father on a weekly basis.  Id.  Examination revealed improved dress and grooming, but a slight malodorous scent, poor personal and impersonal judgment based on history, and poor insight into psychiatric condition, but showing some improvement with his understanding of his potential alcohol and opioid dependence and abuse.  AR908.  His recent and remote memory were grossly intact, his speech was generally coherent, and his mood and affect were described as pretty good with a euthymic quality and slightly restricted range.  Id.  Medication changes were made to try to consolidate medications.  Id.  Mr. Whittle's current stressors related to maintaining his apartment and trying to clean it before it was inspected in two months, and his goal was to try to "remove five bags of garbage per day from now until January" to remove the excess debris.  AR907.

Mr. Whittle was seen on January 5, 2015, for medication management and was currently taking Remeron, Celexa, Seroquel, Clonazepam, and Ambien.  AR901.  He reported that he was doing very good on the medications. Id.  Mr. Whittle's morning Seroquel dose was doubled, and his Ambien cut in half.  AR902.  His prognosis was "fair" with risk factors including substance abuse and personality problems.  AR903.

Mr. Whittle was seen on March 12, 2015, for medication management and reported things are getting better, but he wanted to restart Abilify in the morning, was having trouble sleeping and asking about taking Ambien again,

and was struggling with anxiety and depression.  AR1141.  He said his mood had been stable.  Id.  Examination revealed poor grooming and hygiene, body odor, appeared very anxious, anxious mood, and fair insight and judgment.  AR1142.  Mr. Whittle was cooperative and pleasant, his thought production was logical and coherent, he had no flight of ideas or loosening of associations, and his recent and remote memory were intact.  Id.  Abilify was added to his medications.  Id.

Mr. Whittle was seen on February 8, 2016, for medication management and reported doing "pretty good."  AR1851.  He said he had been in Avera Behavioral Health a few weeks ago for several days due to depressed mood, and his medications were increased.  AR1852.  Mr. Whittle reported that with the change his mood was "good" but he continues to have anxiety that he said was not debilitating, but it was hard to get up and do "normal things" because he was constantly afraid.  Id.  Examination revealed poor hygiene, mostly normal but mildly slowed psychomotor activity, fair concentration and attention, and limited insight and judgment, and his Ambien dosage was increased.  AR1852-53.  Mr. Whittle's eye contact and mood were good, his affect was congruent with mood and full and bright, he was cooperative and pleasant with no odd behaviors, his thoughts were logical and linear without any loosening of associations, he was alert and oriented, and his recent and remote memory were for the most part grossly intact.  AR1853.

Mr. Whittle was seen on June 6, 2016, for medication management and reported things were going "really well" and that his depression and anxiety

were under control, but he was having trouble sleeping. AR1849. Examination revealed fair concentration and attention, limited insight, and limited to fair judgment. AR1850. Mr. Whittle was cooperative and pleasant with no odd behaviors, eye contact was good, his psychomotor activity was normal, his mood was "really good," his affect was congruent with mood and full and bright, his thought processes were logical and linear without any loosening of associations, he was alert and oriented, and his recent and remote memory appeared grossly intact. AR1849-50. His assessments included borderline personality disorder, panic disorder, depression, alcohol and substance abuse in remission, and his GAF was assessed at 45-50. AR1850.

Mr. Whittle was seen on October 10, 2016, for medication management and reported increased anxiety attacks and had been at the ER the prior week. AR2153. He reported doing well with his mood and denied depressive symptoms but reported having frequent panic attacks with a recent bad one resulting in a 911 call and trip to the ER. AR2153. Mr. Whittle reported the frequency of the panic attacks had increased but most of the attacks he uses coping skills such as music or going for a walk. AR2153. On examination, Mr. Whittle's eye contact was good, his mood was euthymic, his affect was congruent to mood, his thought processes were coherent and linear, he was not circumstantial or tangential, and his attention, concentration, insight and judgment were fair. Id. Klonopin was added to his medications for his panic attacks. Id.

Mr. Whittle was seen on January 9, 2017, for medication management and reported doing well. AR2163. He denied any depressive symptoms and he said his sleep, focus and attention were good. Id. Mr. Whittle reported he enjoyed spending time with his family on New Years and was trying to start cleaning his apartment. Id. Examination continued to reveal fair concentration, attention, insight and judgment. Id. His eye contact and grooming were good, his mood was euthymic, his affect was congruent to mood, his thought processes were coherent and linear, he had no loosing of associations or flight of ideas, and he was not circumstantial or tangential. Id.

Mr. Whittle was seen on May 8, 2017, for medication management and reported his anxiety had been much improved, but he was struggling with depression, reduced energy, and overall "being down" and unmotivated. AR2176. His mood was euthymic, his affect was congruent to mood, and his attention, concentration, insight and judgment were fair. AR2176. He was tapered off Celexa and started on Trintellix. Id.

On October 20, 2017, Dr. Bhatara, Mr. Whittle's treating psychiatrist, completed a medical source statement regarding Mr. Whittle's abilities if he were to attempt full-time sustained work to perform basic activities. AR2238-40. Dr. Bhatara indicated Mr. Whittle would have marked limitations in his ability to: perform activities within a schedule, maintain regular attendance and be punctual within normal tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable breaks, (moderate to

49

marked); maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independent of others.  Id. Dr. Bhatara also indicated Mr. Whittle would have moderate limitations in his ability to: maintain concentration and attention for extended periods; sustain an ordinary work routine without special supervision; work in coordination or proximity of others without being distracted by them; make simple work-related decisions; interact appropriately with public; get along with peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.  Id.  Dr. Bhatara felt Mr. Whittle was only mildly limited in the ability to remember locations and work-like procedures and understand, remember, and carry out detailed instructions.  AR2238.  Finally, Mr. Whittle was not significantly limited in the ability to understand, remember and carry out very short and simple instructions.  AR2238.

### 3.    Southeastern Behavioral Health (Caseworker Records):

Mr. Whittle was seen for care-case management at his home on August 4, 2014, by Debby Bongers.  AR910.  He was appropriately groomed, he engaged appropriately in conversation, he maintained appropriate eye contact, and he did not exhibit any overt symptoms or problems.  Id.  Mr. Whittle reported that things were "ok" and he had not had any issues with his neighbors.  Id.  He reported his food stamp account had been closed because he failed to send in the needed form, he was continuing to clean, but was

having problems with fruit flies, and he had no clean clothes because his dad's washing machine was broken.  Id.  Observation revealed poor hygiene: Mr. Whittle and his clothing were not clean, and his insight was poor.  Id.  He was calm and cooperative, his speech was normal, his mood was good, and his thoughts were goal directed and logical.  Id.  Weekly meetings were planned for medication assistance and symptom assessment.  Id.

Mr. Whittle was seen for care-case management at his home on August 11, 2014, and his hygiene was very poor with strong odor, blood on his forehead and stained clothing.  AR911.  Ms. Bongers also observed that Mr. Whittle was appropriately groomed, he engaged appropriately in conversation, he maintained appropriate eye contact, and he did not exhibit any overt symptoms or problems.  Id.  In addition, he was calm and cooperative, his mood was good, his thoughts were logical and goal directed, and his insight appeared fair.  AR911.

Mr. Whittle was seen for care-case management at his home on August 18, 2014, and his hygiene was poor with stains on his clothing and body odor, but he reported having showered three times the last week.  AR912.  He was calm and cooperative, his mood was good, he was appropriately groomed, his thought processes were logical and goal directed, and his insight appeared fair. Id.

Mr. Whittle was seen for care-case management at his home on August 25, 2014, and he reported not having cleaned, not showering and not looking for a job.  AR913.  His hygiene continued poor and it was obvious he had not

showered for some time.  Id.  He was appropriately groomed, his mood was good, and his thought were logical.  Id.

Mr. Whittle was seen for care-case management at his home on September 8, 2014, and he suggested meeting bi-weekly, but the case worker rejected the idea.  AR914.  He continued with poor hygiene.  Id.

Mr. Whittle was seen for care-case management in the office following his release from Avera Behavioral Health due to his anxiety on September 14, 2015.  AR1143.  He stated he had such high anxiety about how much cleaning he needed to do in his apartment that he ended up cutting his wrists as a coping skill.  Id.  His hygiene continued to be poor.  Id.  He was appropriately groomed, his mood was good, his thoughts were goal directed and logical and his insight was fair.  Id.

Mr. Whittle was seen for care-case management at his home on May 1, 2017. AR2174.  He refused to let the case worker into his home.  The lighting was poor so it was difficult to see the condition, but Mr. Whittle admitted he had made no progress on cleaning his apartment even though he was going to ask his dad to pay to have someone else clean it.  When informed he may be losing his housing assistance, he was unaware.  AR2174.  His caseworker asked whether he had been drinking due to "some strange voicemails" he had left her, but Mr. Whittle denied drinking and was unsure about the voicemails. Id. His hygiene was fair, he was calm and cooperative, and his mood was good. Id.

The last care-case management appointment documented in the appeal record was on September 5, 2017, with Debby Bongers. AR2190. Ms. Bongers had been Mr. Whittle's case manager for multiple years with treatment weekly or biweekly appointments documented in the appeal record since August, 2014. AR910, 2190. Ms. Bongers noted Mr. Whittle's hygiene was poor, he continued to be unable to keep his apartment clean, and he had poor insight. Id. His mood was fair, he was calm and cooperative, and his thoughts were goal directed and logical. Id.

On October 2, 2017, Ms. Bongers, Mr. Whittle's case manager since at least 2014, completed a medical source statement regarding Mr. Whittle's abilities if he were to attempt full-time sustained work to perform basic work activities. AR2234-36. Ms. Bongers indicated Mr. Whittle would have marked limitations in his ability to: perform activities within a schedule, maintain regular attendance and be punctual within normal tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable breaks; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independent of others. Id. Ms. Bongers also indicated Mr. Whittle would have moderate limitations in his ability to: maintain concentration and attention for extended periods; sustain an ordinary work routine without special supervision; work in coordination or proximity of others without being distracted by them; make simple work-

related decisions; interact appropriately with the public; accept instructions and respond appropriately to criticism from supervisors; get along with peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. Id. Ms. Bongers felt Mr. Whittle was mildly limited in the ability to remember locations and work-like procedures and understand, remember, and carry out detailed instructions. AR2234. In addition, he was not significantly limited in the ability to understand, remember, and carry out very short and simple instructions. AR2234. Ms. Bongers stated, "Sean can follow instructions, but his high anxiety causes issues following through." AR2236.

### 4. State Agency Assessments

The State agency physician consultant at the initial level on March 26, 2016, found that Mr. Whittle had severe Other Disorder of the Urinary Tract, but did not complete a RFC assessment. AR81. The State agency physician consultant at the reconsideration level on July 20, 2016, found that Mr. Whittle had no severe physical impairments. AR1174.

The State agency psychological expert at the initial level on March 30, 2016, found severe mental impairments of affective disorder, personality disorder, and alcohol and substance addiction disorder. AR82. The expert considered drug addiction and alcoholism ("DAA") and found that Mr. Whittle had marked limitations in activities of daily living, marked difficulties maintaining social functioning, moderate limitations in maintaining concentration, persistence, or pace, and three episodes of decompensation. Id.

The expert noted that the case-management records described conflicts with neighbors, poor hygiene and grooming, and neglect of his residence placing his tenancy in jeopardy. AR83. The expert stated, "This assessment reflects his functioning when using ETOH and other substances. DAA is material to the claims, and he is disabled when DAA is considered." AR88.

The State agency psychological expert at the initial level stated "no current mental health counseling is documented" but did not mention the multiple references in the record to mental health counseling. AR83.

The State agency psychological expert at the initial level stated when not using substances Mr. Whittle was capable of work "as described in the MRFC." Id. The MRFC stated Mr. Whittle could do work of limited complexity which is low stress in nature and does not require close or frequent interaction with others, and he can respond appropriately to supportive supervision, but he should have no more than occasional brief and superficial interaction with co-workers and the public. AR85-86.

The State agency psychological expert at the initial level asserted Mr. Whittle's mental condition would improve to the point of non-disability in the absence of DAA. AR88. The State agency psychological expert at the initial level did not identify what evidence in the file established that Mr. Whittle's co-occurring mental disorders would not be disabling in the absence of DAA. AR82-88.

The State agency psychological expert at the reconsideration level on July 26, 2016, found medically determinable impairments of affective disorder,

personality disorder, and alcohol and substance addiction disorder, but stated they were all non-severe. AR118-20. The expert found that Mr. Whittle had mild limitations in activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace, and no episodes of decompensation. AR118.

**D.     Testimony at the ALJ Hearing**

**1.     Mr. Whittle's Testimony**

Mr. Whittle testified he receives help with his rent from his father, his father gives him quarters to do his laundry, and his father takes him grocery shopping and brings him groceries.  AR42, 53.

Mr. Whittle testified that he did not work at Get-n-Go, which was Olson Oil Company, for more than one month.  He worked there just one month. AR43.

Mr. Whittle testified he had been involuntarily committed several times, and had been homeless for about a year in 2010, and he was panicky and depressed.  AR45.  Mr. Whittle testified he had been sent to Yankton involuntarily several times due to suicidal ideation and panic attacks.  AR45-46.

Mr. Whittle testified he took clonazepam up to four times per day.  Id. He testified that he did not think he could live alone without help from his caseworker, he felt restless all the time, he felt fatigued from shaking and his muscles ached, and he has trouble concentrating if he's around people. AR54-55.

Mr. Whittle testified he had been seeing a therapist named Angie Peck, but had moved recently and didn't have a ride so he had not been seeing her for a while.  AR59.

**2.    Vocational Expert Testimony:**

The ALJ then asked a hypothetical question to the vocational expert ("VE"): assume a hypothetical individual of Mr. Whittle's age, education with the past work experience with no exertional limitations, but is limited to simple routine tasks and occasional superficial contact with coworkers and the public. AR65. The VE testified that the individual could do the job of gas station attendant or clerk. Id. The VE asserted that the "contact they have with the public is very, very much superficial and occasional would be a third of the day, so maybe depending on how busy the particular gas station is, but I would say generally that would be possible with that limitation. Id.

The VE testified that an individual would be unemployable if they were off task more than one hour per day or missed four days per month of work. AR66. Thee VE testified that an individual would also be unemployable if they had marked limitations in their ability to maintain a schedule and regular attendance, to complete a normal workday without interruptions from psychologically based symptoms, to maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness, and the VE said there would be no work.  AR67.

## E.    Other Evidence

Mr. Whittle's earning record showed earnings from Olson Oil Company in 2007 of $965.56. AR248. Mr. Whittle completed a Disability Report in which he indicated he had worked at Get-n-Go during March and April 2007, working nine hours per day six days per week, and was paid $7.50 per hour. AR268.

## F.    Disputed Facts

1.    The ALJ also found that Mr. Whittle had medically determinable impairments of GERD and kidney stones but determined they were non-severe. AR20.

The Commissioner disputes this asserting that it is a "characterization" of the record not a fact.

2.    The ALJ stated in the decision, "The vocational expert testified that his answers were consistent with the Dictionary of Occupational Titles pursuant to SSR 00-4p" however, no such testimony exists anywhere in the record; the ALJ never inquired whether the vocational expert's testimony was consistent with the DOT.  AR29, 36-69.

The Commissioner disputes this asserting that it is a "characterization" of the record not a fact, but did not point to any place in the appeal record that includes such testimony.

3.    Mr. Whittle was seen for care-case management at his home on August 4, 2014, by Debby Bongers. AR910. The note does not indicate this was a first visit, and other Southeastern Behavioral Health records also reference another case-manager by the name of Jennie M. AR907, 910.

The Commissioner disputes this asserting that it is a "characterization" of the record not a fact.

4. Mr. Whittle continued to have weekly or biweekly care-case management at his home from September, 2014 through August, 2015, with ongoing issues related to cleaning his apartment, personal hygiene, housing, and problems with his neighbors and landlord. AR915-56. Throughout these meetings Mr. Whittle's hygiene was fair to poor, he was moody at times, isolating or staying at home frequently, and his insight was generally poor. AR915-56.

The Commissioner disputes this asserting that most of the treatment notes say his mood was good to fair and insight fair to good.

5. Mr. Whittle continued to have weekly or biweekly care-case management from September, 2015 through April, 2017, with ongoing issues related to cleaning his apartment, personal hygiene, housing, and problems with his neighbors and landlord. AR1144-50, 1860-70, 2143-51, 2155-61, 2164-73. Throughout these meetings Mr. Whittle's hygiene was fair to poor, he was moody at times, isolating or staying at home frequently, and his insight was generally poor. AR1144-50, 1860-70, 2143-51, 2155-61, 2164-73.

The Commissioner disputes this asserting that many of these treatment notes say he had fair hygiene and a good mood.

6. Mr. Whittle continued to have weekly or biweekly care-case management from May, 2017 through September, 2017, with ongoing issues related to cleaning his apartment, personal hygiene, his smell, housing and

59

problems, and relapses with alcohol. AR2177-80, 2183-90. Throughout these meetings Mr. Whittle's hygiene was fair to poor, he was moody at times, and his insight was generally poor. AR2177-80, 2183-90.

The Commissioner disputes this asserting that some treatment notes show fair hygiene, good mood, and fair insight.

7.     The Appeal record includes numerous references to individual therapy or counseling in addition to the care-case management sessions with therapy with "Angela" from Southeastern Behavioral Health, but no therapy treatment records are present in the Appeal Record. AR936, 1047, 1810, 1825, 1836, 1859, 1863, 1864.

The Commissioner disputes this asserting that it is a "characterization" of the record not a fact.

8.     The State agency physician consultant at the initial level never mentioned Mr. Whittle's migraine headaches. AR81. Similarly, the State agency physician consultant at the reconsideration level never mentioned Mr. Whittle's migraine headaches. AR117.

The Commissioner disputes this, asserting that it is a "characterization" of the record, not a fact.

9.     The ALJ never asked the VE whether his testimony was consistent with the Dictionary of Occupational Titles. AR65-69.

Commissioner disputes this, asserting that it is a "characterization" of the record, not a fact.

10.     The State agency psychological expert at the initial level stated "no current mental health counseling is documented" but did not mention the multiple references in the record to mental health counseling. AR83.

The Commissioner objects to the comment regarding the State psychological expert's failure to mention the references in the record to mental health counseling, because it is a "characterization" of the record, not a fact.

## DISCUSSION

### A.     Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627.   The Commissioner's decision may not

be reversed merely because substantial evidence would have supported an opposite decision. Woolf v. Shalala 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.    The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment

must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. <u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. <u>Bartlett</u> 777 F.2d at 1320, n.2. This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. <u>Heckler v. Campbell</u>, 461 U.S. 458, 460, (1983). If the applicant's

impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

The court notes that when a drug and/or alcohol addiction are among the claimant's impairments, the five-step analysis is more involved and requires additional inquiries.  These additional inquiries, and whether the ALJ properly performed them, will be discussed in further detail in section E.1, below.

**C.**     **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).

The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

**D.      The Parties' Positions**

Mr. Whittle asserts the Commissioner erred by finding him not disabled within the meaning of the Social Security Act. He asserts the Commissioner erred in three ways: (1) The ALJ did not properly evaluate Mr. Whittle's drug and alcoholism impairments; (2) The ALJ failed to properly determine whether Mr. Whittle met or equaled a Listing at Step 3 of the sequential analysis; and (3) The ALJ improperly determined Mr. Whittle could return to past relevant work. The Commissioner asserts the denial of disability benefits is supported by substantial evidence and the decision should be affirmed.

**E.      Analysis**

Mr. Whittle's arguments are addressed in turn below:

**1.      Whether the ALJ Properly Evaluated Mr. Whittle's Drug and Alcohol Addiction ("DAA") Impairment?**

Mr. Whittle's first assignment of error is that the ALJ failed to properly evaluate his drug and alcohol addiction impairment ("DAA"). Mr. Whittle claims the ALJ erred when evaluating his DAA in two basic ways: (1) the ALJ did not follow the procedures mandated by the Social Security Administration's own rules and regulations about how to evaluate a disability claim when DAA is one of the claimant's medically determinable impairments; and (2) the ALJ

improperly evaluated the medical opinion evidence regarding the effects of Mr. Whittle's DAA. Mr. Whittle asserts the ALJ's failure to properly evaluate his DAA essentially short-circuited the remainder of the disability determination.

Before embarking on the first half of Mr. Whittle's argument regarding the manner in which the ALJ evaluated his DAA impairment, the court takes a brief detour. In their joint statement of material facts, the parties agreed there were several medical records obviously missing from the appeal record. This is because those records were mentioned in the records of the providers that treated Mr. Whittle—but the records mentioned by Mr. Whittle's providers are not found in the SSA's appeal record.

The missing records are as follows: (1) records from a Mitchell treatment facility where Mr. Whittle received treatment in June, 2010; (2) records from a treatment center—probably the HSC in Yankton—from August, 2010; (3) records from an involuntary mental hold at Avera Behavioral Health and then an inpatient stay at the HSC in Yankton in July, 2010; (4) records from an inpatient stay at the HSC in Yankton in September, 2010; (5) records from a four-day stay at the HSC in Yankton in December, 2010; (6) records from two unknown, undated stays at the HSC in Yankton in 2011; (7) records from two unknown, undated stays at Keystone treatment center in 2011; (8) records from psychiatrist Dr. Fuller from 2011; (9) records pre-dating 2014 from Mr. Whittle's case manager at Falls Community Health; (10) psychiatric treatment records from CHC (presumably Community Health Clinic) for the

year 2012; (11) psychiatric treatment records from the Fifth Street Connection and/or Falls Community Health for the year 2012; (12) records from Southeastern Behavioral Health which pre-date August, 2014; (13) an in-patient admission for Avera Behavioral Health from March, 2014.

In his opening brief, Mr. Whittle asserts the ALJ failed to acknowledge the time Mr. Whittle missed from work and will likely miss in the future. This is because even without the missing medical records, there is proof of over 100 trips to the emergency room plus multiple inpatient stays related to either his DAA or his mental health issues over the course of several years. The Commissioner argues it was Mr. Whittle's responsibility—not the SSA's--to gather the records and prove his case. The duty of the ALJ to develop the record—with or without representation of counsel--is a widely recognized rule of long standing in social security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial. Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing. The ALJ possesses no interest in denying benefits and must act neutrally in developing the record.

Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004) (citations omitted). See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel). If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification. McCoy v.

Astrue, 648 F.3d 605, 612 (8th Cir. 2011). However, this is true only for "crucial" issues. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). In this case, the missing records qualified as "crucial" to determine whether Mr. Whittle was disabled and if so, whether his DAA contributed materially to his disability. On remand every effort should be made to obtain the above-referenced records.

In 1996, Congress enacted what has become known as the Contract with America Act. As part of that legislation, the Social Security Act was amended to deny disability benefits to a claimant if alcoholism or drug addiction is a contributing factor which is "material" to the determination that the claimant is disabled. See 42 U.S.C. § 423(d)(2)(C). To determine if alcoholism or drug addiction is "material" to disability, the SSA inquires whether the claimant would remain disabled if the claimant stopped using drugs or alcohol. See 20 C.F.R. §§ 416.935(b); 404.1535(b). The focus of the inquiry is on the impairments which would remain assuming the claimant ceased the substance abuse, and whether the remaining impairments would be disabling in the absence of the claimant's substance abuse. Rehder v. Apfel, 205 F.3d 1056, 1060 (8th Cir. 2000).

In addition to the Code of Federal Regulations, the Social Security Administration has implemented a Social Security Ruling ("SSR") to assist in the interpretation of 42 U.S.C. § 423(d)(2)(C) and 20 C.F.R. §§ 416.935(b) & 404.1535(b). See SSR 13-2p. This interpretive policy explains how the SSA considers whether DAA is a contributing factor which is material to claimant's

68

disability.  SSR 13-2p § 5 directs that the SSA follow a six-step procedure to evaluate whether DAA is material to a claimant's disability.  The six steps are as follows:

> Step one: does the claimant have DAA? :  If no, then no DAA materiality determination is necessary.  If yes, go to Step two.

> Step two:  Is the claimant disabled including all impairments, including DAA?:  If no, do not determine DAA materiality and deny the claim.  If yes, go to step three.

> Step three:  Is DAA the only impairment?  If yes, DAA is material and deny the claim.  If no, go to step four.

> Step four:  Is the other impairment(s) disabling by itself while the claimant is still dependent upon or using drugs/alcohol?  If no, DAA is material to disability and deny the claim.  If yes, go to step five.

> Step five:  Does DAA cause or affect the claimant's medically determinable impairment(s)?  If no, DAA is not material and allow the claim.  If yes, but the other impairment(s) is irreversible or could not improve to the point of non-disability, DAA is not material and allow the claim.  If yes, and DAA could be material, go to step six.

> Step six:  Would the other impairment(s) improve to the point of non-disability in the absence of DAA?  If yes, DAA is material and deny the claim.  If no, DAA is not material and allow the claim.

See SSR 13-2p, § 5.  The SSA has acknowledged that this final step

> includes some of the most complex cases for the DAA materiality analysis, because at this point, we have determined that: the claimant has DAA and at least one other medically determinable physical or mental impairment; the other impairment(s) could be disabling by itself; and the other impairment(s) might improve to the point of non-disability if the claimant were to stop using drugs or alcohol.

> At this step, we must project the severity of the claimant's other impairment(s) in the absence of DAA.  We make this finding based on the evidence in the claimant's case record.  In some cases, we may also consider medical judgments about the likely remaining

medical findings and functional limitations the claimant would
have in the absence of DAA.  How we make this finding differs
somewhat depending on whether the claimant's other
impairment(s) is physical or mental . . . .

SSR 13-2p, § 5.f.i-ii.

In Rehder, the court explained the analysis required to determine

whether DAA is a contributing factor which is material when a claimant has

been deemed disabled.  Rehder, 205 F.3d at 1060.  First, assuming the

claimant is disabled when the substance abuse is included in the

determination, the ALJ must determine which of the claimant's impairments

would remain if the claimant refrained from drug and alcohol use.  Id.  Then,

the ALJ must determine whether the remaining limitations would be disabling.

Id.; 20 C.F.R. § 1535(b)(2).  If the claimant's remaining limitations would not be

disabling, the claimant's drug abuse or alcoholism is a contributing factor

which is material to the determination of disability and benefits should be

denied.  Rehder, 205 F.3d at 1060; 20 C.F.R. § 404.1535(b)(2)(i).  If the

claimant would still be considered disabled due to his or her remaining

limitations, the claimant is disabled and entitled to benefits.  Rehder, 205 F.3d

at 1060; 20 C.F.R. § 404.1535(b)(2)(ii).

The burden of proving that DAA is not a contributing factor which is

material to the disability determination falls on the claimant.  Brueggemann v.

Barnhart, 348 F.3d 689, 694 (8th Cir. 2003).  The ALJ, however, retains the

responsibility to fully and fairly develop the record.  Id.  In Brueggemann, the

court explained that if the ALJ is unable to determine whether DAA is a

contributing factor material to a claimant's otherwise-acknowledged disability,

the claimant's burden has been met and an award of benefits must follow. Id. In other words, on the issue of materiality, in the event of a tie, the claimant wins. Id.

In Brueggemann, the ALJ failed to mention or follow the SSA's regulations regarding how to determine whether the claimant's DAA was a material factor in his alleged disability. Brueggemann, 348 F.3d at 694. This failure, the court found, was not simply an "opinion writing" deficiency, but instead constituted a failure on the part of the ALJ to fully and fairly develop the record and therefore, constituted legal error. Id. at 695. In Brueggemann, instead of following the procedure mandated by the SSA regulations, the ALJ simply carved out the opinion evidence provided by the claimant's treating physicians because the ALJ (apparently) believed their opinions were based upon the effects of the claimant's drug and alcohol use. Id. The ALJ stated that "under the current statutory scheme the use/abuse of drugs and alcohol and the consequent effects are not permitted to be used to form a basis for disability. Thus, little if any weight is given to the opinion of the treating psychiatrist that the claimant has poor ability to deal with stress." Id. at 693. Excluding this testimony, the ALJ concluded the analysis, and found the claimant was not disabled. Id.

The court determined the ALJ erred because the plain text of the regulation requires the ALJ to *first* determine whether the claimant is disabled, and the ALJ must reach this determination using the standard five-step analysis *without segregating out any effects that might be due to substance use*

71

*disorders.* "The inquiry here concerns strictly symptoms, not causes, and the rules for how to weigh evidence of symptoms remain well established. Substance use disorders are simply not among the evidentiary factors our precedents and the regulations identify as probative when an ALJ evaluates a physician's expert opinion in the initial determination of the claimant's disability." Id. at 694. The court noted that though trying to determine which limitations would remain if the claimant stopped using drugs and alcohol (assuming he is still using) is a difficult task because it would be purely hypothetical, it is a task which the ALJ must undertake in order to fully and fairly develop the record. Id. at 695. Otherwise, the court explained the ALJ's conclusion will not be supported by substantial evidence. Id.

The court concluded the nature of the ALJ's abbreviated decision making on the DAA issue deprived the court of a solid record on whether DAA was a material factor contributing to the determination of the claimant's disability. Id. The court guessed the claimant would probably be disabled independently of his DAA, but it remanded the case for a proper analysis by the ALJ. Id. at 696.

The Social Security Administration's policy interpretation ruling (SSR 13-2p) regarding DAA was issued on February 20, 2013. The ruling clarifies many aspects of the agency's methods for determining how to handle the issues that arise when one of a claimant's severe impairments is DAA. One such issue is the effect of DAA upon the claimant's other impairments if one or more of those impairments are mental impairments. See SSR 13-2p: GENERAL § 7, "What do we do if the claimant's co-occurring mental disorder(s) improve in the absence

of DAA?" SSR 13-2p acknowledges the SSA is not aware of any research or data that can reliably predict that a co-occurring mental impairment or disorder would improve, or the extent to which it might improve, if the claimant were to stop using drugs or alcohol. Id. Therefore, to support a finding that DAA is material, there must be evidence in the case record that establishes a claimant with a co-occurring mental disorder would not be disabled in the absence of DAA. This issue is extremely important in Mr. Whittle's case, because the majority of impairments he claimed on his application and the impairments the ALJ ultimately found to be severe are mental impairments (anxiety, bipolar disorder, depression, and personality disorder).

Unlike cases involving physical impairments, adjudicators may not rely exclusively on medical expertise and the nature of a claimant's mental disorder. Id. SSR 13-2p also provides that "we will find DAA is not material to the determination and allow the claim if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorders would improve to the point of non-disability in the absence of DAA." See SSR 13-2p: GENERAL § 7(d) "What do we do if the claimant's co-occurring mental disorder(s) improve in the absence of DAA?"

The SSA also explains, however, that it will not continue to develop evidence of DAA if the evidence it has obtained about a claimant's other impairments is complete and shows the claimant is not disabled. See SSR 13-2p: GENERAL, § 8.a.ii ("What evidence do we need in cases involving DAA"). See also Fastner v. Barnhart, 324 F.3d 981, 986 (8th Cir. 2003) (ALJ did not err by

failing to properly apply 20 C.F.R. § 404.1535(b) to determine materiality of DAA, because ALJ determined claimant was not disabled even considering claimant's DAA)).

The court now turns to the ALJ's discussion of DAA in Mr. Whittle's case. The ALJ centered its discussion about the materiality of Mr. Whittle's DAA around the weight to be assigned to the State agency psychological consultant opinions. See AR27. On initial consideration of Mr. Whittle's claim, the State agency psychological consultant (Marsha McFarland, Ph.D.) determined Mr. Whittle's DAA was severe (AR82) and should be considered in the disability determination Id. Dr. McFarland determined Mr. Whittle also suffered from two severe mental impairments—affective disorder and personality disorder. Id.

Dr. McFarland opined Mr. Whittle's substance abuse disorder caused his depressive syndrome symptoms, characterized by the following: appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, and suicidal thoughts. Id. Dr. McFarland indicated Mr. Whittle exhibited marked restriction in activities of daily living and in maintaining social functioning,[16] and moderate difficulties in maintaining concentration, persistence and pace.

_____

[16] Though it is not explicitly spelled out in the form, Dr. McFarland's opinion equaled a finding Mr. Whittle met the § 12.04 Listing if his DAA symptoms were included in the consideration. This is because the expert indicated that when Mr. Whittle's DAA was considered, five of the A criteria for § 12.04 (affective disorder) were met and two of the "B" criteria were markedly limited. See AR82. Though the expert indicated all of the A criteria were caused by Mr. Whittle's DAA, that is why the expert indicated Mr. Whittle's DAA was material to the finding that he was disabled. See AR83. This finding is discussed in further detail in Section E.2 of this opinion below.

She indicated Mr. Whittle had suffered three episodes of decompensation, each of extended duration. Id. The consultant specified this Psychiatric Review Technique Form ("PRTF") represented Mr. Whittle's condition assuming he continued to use substances. Id.

Dr. McFarland further opined Mr. Whittle's DAA was material to his disability claim and that when not using substances, he would be capable of work as described in the "MRFC." The MRFC (mental residual functional capacity assessment) is found at AR84-86. Dr. McFarland opined that without the use of substances, Mr. Whittle's capabilities would differ significantly from when he was using substances. AR84-86.

Assuming Mr. Whittle discontinued using substances, Dr. McFarland predicted the following capabilities for Mr. Whittle: he would be able to understand and remember complex instructions. AR85. He would be able to carry out short and simple instructions. Id. He would not be significantly limited in his ability to carry out detailed instructions. Id. His ability to maintain attention and concentration for extended periods would not be significantly limited. Id. His ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances would not be significantly limited. Id. His ability to sustain an ordinary routine without special supervision would not be limited at all. Id. His ability to work in coordination with or in proximity to others without being distracted by them would be moderately limited. Id. His ability to make simple work-related decisions would not be significantly limited. Id. His ability to complete

a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods would be moderately limited.  Id.

Here, Dr. McFarland explained Mr. Whittle would be capable of doing work which was of limited complexity and which was low stress in nature and did not require close or frequent interaction with others.  Id.  His ability to interact with the general public would be moderately limited.  Id.  There was no evidence that his ability to ask simple questions or request assistance would be limited at all.  Id.  His ability to accept instructions and respond appropriately to criticism from supervisors would be moderately limited, as would be his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  AR86.

His ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness would not be significantly limited.  Id. Dr. McFarland explained Mr. Whittle could respond appropriately to supportive supervision, and that he should have no more than occasional brief and superficial interaction with coworkers and the general public.  Id.

Dr. McFarland also explained that in the absence of substance use, Mr. Whittle would not be significantly limited in his ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel to unfamiliar places or use public transportation, or set realistic goals and make plans independently of others. Id.  These opinions were offered by Dr. McFarland in March, 2016.

At the reconsideration level (in July, 2016, four months after the initial denial) Mark Berkowitz Psy.D. was the consulting State agency psychologist who reviewed Mr. Whittle's file. AR118. Dr. Berkowitz also identified substance abuse, affective disorders, and personality disorders as Mr. Whittle's impairments, but opined that all of these impairments were non-severe. Id. Dr. Berkowitz indicated Mr. Whittle's restrictions on activities of daily living, difficulties in maintaining social functioning, maintaining concentration, persistence and pace were all mild. Id. Mr. Whittle had experienced no episodes of decompensation that were of extended duration. AR118. Dr. Berkowitz explained this opinion covered the period of alleged date of onset to the present. Id.

Dr. Berkowitz explained Mr. Whittle had "recently obtained sobriety and not surprisingly, he has improved significantly." AR119. Dr. Berkowitz explained that while Mr. Whittle's symptoms were "partially consistent" with his allegations and that his symptoms could adversely affect his ability to persist in some work settings, the alleged severity was not supported as his conditions appeared to be not severe in terms of signs, symptoms and functional impact. Id.

The ALJ considered both these State agency consultant opinions in formulating Mr. Whittle's RFC AR27. The ALJ rejected Dr. McFarland's finding that Mr. Whittle's DAA was material to her determination at the initial level that Mr. Whittle was disabled, and the ALJ also rejected Dr. Berkowitz's finding

at the reconsideration level that none of Mr. Whittle's mental impairments were severe.  Id.  The ALJ stated:

> While it is true that the claimant had significant alcohol and drug abuse issues early on in the relevant period resulting in multiple emergency room admissions for withdrawal symptoms, they were not accompanied by evidence of mental dysregulation or decompensation and he was not hospitalized for two weeks or longer.  The claimant's functioning during that period, while certainly affected by drug and alcohol usage, did not result in the increased need for mental health treatment or hospitalizations.  As for the finding of non-severity, the undersigned rejects those assessments as well.  The treatment notes document that the claimant's usage of substances has decreased with time.  However, he still uses.  Nonetheless, it has not resulted in extended duration hospitalizations.  The treatment notes document that the claimant became more of a binge user.  The more recent records have documented deficits in the mental status examinations during his periods of sobriety, but not to a marked level.  Therefore, the undersigned affords little weight to the State agency psychological consultants' assessments.

AR27.

Mr. Whittle asserts this discussion by the ALJ wholly fails to comply with 20 C.F.R. § 404.1535(b).  The Commissioner asserts the ALJ did comply with 20 C.F.R. § 404.1535(b), because it did not need to overtly discuss whether Mr. Whittle's DAA was material to disability in light of its finding that Mr. Whittle was not disabled even considering the effects of his DAA.

SSR 13-2p § 5 contains the six-part evaluation process the SSA undertakes to "unravel" the materiality determination when DAA is one of a claimant's severe impairments.  If a claimant has DAA and is disabled when DAA is considered along with the other impairments, then the ALJ must unravel or disentangle the DAA from the other impairments to figure out whether the claimant's disability will remain in the absence of DAA.

78

Mr. Whittle's basic premise underlying this first assignment of error is his assertion that the ALJ's determination Mr. Whittle is not disabled considering all impairments *including* DAA is not supported by substantial evidence. Assuming that is what the ALJ intended to find, the court agrees with Mr. Whittle. The problem is, it is not at all clear the ALJ ever made such a finding. The manner in which the ALJ approached the problem is extremely confusing—because the ALJ not only failed to mention 42 U.S.C. § 423(d)(2)(C), 20 C.F.R. § 404.1535(b) or SSR 13-2p, it also failed to even acknowledge its obligation to undertake the process required by those statutes or regulations.

The Commissioner asserts the ALJ was not required to undertake the process outlined in SSR 13-2p because the necessity for the process was negated by the ALJ's finding that Mr. Whittle was not disabled at all. But for that reasoning to hold water, the ALJ's finding that *even including the symptoms caused by DAA*, Mr. Whittle was not disabled must be supported by substantial evidence. The court begins by stating the obvious: there is no reading of this record which supports a such a finding. Assuming for a moment that the ALJ intended to find that even including Mr. Whittle's DAA symptoms Mr. Whittle is not disabled, it is impossible to draw the same conclusion as the ALJ did from the evidence in the record, so the Commissioner cannot be affirmed. Oberst, 2 F.3d at 250.

As explained in Brueggemann, the ALJ must base its *initial* disability finding on substantial evidence of Mr. Whittle's medical limitations without deductions for the assumed effects of substance use disorders. Brueggemann,

348 F.3d 689, 694. This *initial* inquiry concerns strictly symptoms—not causes—and substance abuse disorders are not among the evidentiary factors the ALJ may use as probative when the ALJ evaluates whether (in the initial inquiry) Mr. Whittle is disabled. The ALJ divided its analysis into earlier versus later time frames and indicated Mr. Whittle's DAA in the earlier time was significant, while more of a binge nature in the later time frame. The ALJ also stated the treatment Mr. Whittle sought during the entire relevant time frame did not result in lengthy hospitalizations. The ALJ failed to acknowledge, however, that regardless of whether Mr. Whittle's DAA was significant or binge nature, and regardless of whether his hospital stays were a few hours or a few weeks, Mr. Whittle's DAA-related hospitalizations would have caused repeated absences from work, irregular attendance and unpredictable work performance.

Whether the hospitalizations lasted two hours or two weeks is irrelevant to an employer who cannot depend upon an employee to show up to work day in and day out on a regular basis. And the VE testified that an employee who is off task more than one hour per day, or who misses more than four days of work per month would be unemployable. AR66-67.

The court can only conclude, therefore, that the ALJ in this case erroneously discounted the symptoms caused by Mr. Whittle's DAA when making the initial determination that Mr. Whittle was not disabled. This was an error of law, requiring reversal. Brueggemann, 348 F.3d at 694; 20 C.F.R. § 404.1535(b); SSR 13-2p.

The court next turns to Mr. Whittle's suggestion that the ALJ's error in failing to properly evaluate his DAA was also caused in part by the ALJ's failure to properly evaluate the medical opinion evidence in the file. Mr. Whittle asserts the ALJ erroneously rejected all medical opinions in the file and instead "played doctor" by making its own inferences about Mr. Whittle's abilities assuming he stopped using alcohol and drugs, citing Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) (ALJ may not "play doctor.").

In her brief, the Commissioner asserts the ALJ properly rejected the State agency opinions that Mr. Whittle is disabled when his DAA is considered along with his other impairments. The Commissioner asserts this is so because although Mr. Whittle was hospitalized many times in connection with his DAA problems (i.e. for withdrawal symptoms) these hospitalizations were not accompanied by symptoms of mental dysregulation or decompensation and the hospitalizations did not last for two weeks or longer. The Commissioner also argues that even while abusing substances, Mr. Whittle received minimal psychiatric treatment. This argument, however, goes to whether Mr. Whittle's DAA contributes materially to his remaining mental impairments, not to whether he was disabled in the first place when his DAA is included in the calculation. The Commissioner, like the ALJ, is overlooking the first step (or more accurately the first several steps) in the process – steps which are mandated by statute and regulation. See 20 CFR § 404.1535(b); SSR 13-2(p).

The State agency expert at the initial level (Dr. McFarland) opined that, when Mr. Whittle's DAA is included, Mr. Whittle is disabled. As explained in

footnote 16 above, this is because when Mr. Whittle's DAA is included,

Mr. Whittle's mental impairments met a Listing at Step 3 of the analysis.  See

AR82 (indicating the A criteria were met and "marked" limitations in two of the

"B" criteria as they were defined at the time were present, which qualified

Mr. Whittle for Listing level mental impairment under 20 C.F.R. Pt. 404, Sub

Pt. P. App. 1. § 12.04 (Depressive, bipolar, and related disorders)).

Mr. Whittle's treating psychiatrist (Dr. Bhatara) agreed that Mr. Whittle is

markedly limited in certain functions within three categories of the "B" function

abilities in the revised regulations:  concentration, persistence and pace;

interaction with others; and adapting or managing oneself.[17] AR2238-40.

Mr. Whittle's case worker (Debby Bongers, who is supervised by Dr. Bhatara)

assigned these same limitations.  AR2234-36.  Neither of these treating

providers, however, was asked to give an opinion about Mr. Whittle's

capabilities in the absence of DAA.  Id.

The State agency psychological consultant at the reconsideration level

(Dr. Berkowitz) gave an opinion solely about Mr. Whittle's abilities in the

absence of DAA, noting that Mr. Whittle had "recently" gained sobriety.  AR119.

This opinion was rendered only a few months later than the first State agency

opinion, and it purported to cover the entire time period from date of onset to

the present.  Dr. Berkowitz, however, noted zero periods of decompensation

and only mild impairments (including Mr. Whittle's non-DAA impairments)

---

[17] The "B" criteria were changed effective January 17, 2017.  This change
is discussed in depth later in this opinion.

whereas the State agency psychological consultant at the initial level (Dr. McFarland) acknowledged three such episodes for the same time frame, and found that all of Mr. Whittle's mental impairments including DAA were severe. AR82. The ALJ gave little weight to Dr. Berkowitz' opinion. AR27.

The ALJ also considered but partially rejected the opinions of Mr. Whittle's treating physician and therapist, who opined Mr. Whittle would have marked limitations in several areas of functioning if he attempted full-time employment. Again, however, the treating physician and therapist were never asked to segregate Mr. Whittle's limitations during times of sobriety versus times of substance abuse, despite their first-hand observation of him during both.

The ALJ disregarded the only medical opinions in the file (the State agency consultants) as to the severity of Mr. Whittle's mental impairments in the absence of DAA, rejected the opinions of Mr. Whittle's treating physicians as to their opinions about his limitations assuming the effects of DAA were included, and failed to inquire of the treating physician about what Mr. Whittle's limitations might be assuming Mr. Whittle was able to stop abusing substances. The ALJ therefore had no medical information upon which to base its finding that Mr. Whittle was not disabled and/or whether DAA was material to his disability or to his remaining mental impairments. This was error. It is well established that an ALJ may not substitute its own opinion for that of the physicians, and may not draw its own inferences as to the relevance of the medical records. Combs v. Berryhill, 878 F.3d 642, 647

(8th Cir. 2017); <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1070 (8th Cir. 2004) (the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports.").

Rather than seeking a medical opinion about the severity of Mr. Whittle's mental impairments should Mr. Whittle succeed for any significant period of time in abstaining from substance abuse, the ALJ drew its own inferences about that issue. This the ALJ is prohibited from doing. <u>Combs</u>, 878 F.3d at 646; <u>Strongson</u>, 361 F.3d at 1070.

Remand is required for a clear decision from the SSA regarding Mr. Whittle's disability status including his DAA and whether his DAA is material to disability. On remand, the ALJ is instructed to follow the SSA's own mandate contained in 20 C.F.R. § 404.1535(b) and SSR 13-2p.

Mr. Whittle makes one final argument about the ALJ's evaluation of his DAA impairment. Mr. Whittle asserts that because the ALJ failed to follow the SAA's rules and regulations about how to "untangle" DAA from a claimant's other impairments to determine whether DAA is material to a claimant's disability, the ALJ altogether missed some of Mr. Whittle's other impairments which otherwise might have been significant to the disability evaluation. <u>See, e.g.</u> Docket 20, p. 10 (citing Mr. Whittle's headaches as an example). Mr. Whittle argues that even though his headaches are mentioned many times in the medical records, the ALJ simply assumed the headaches would not have been present had it not been for his substance abuse so the ALJ did not account for his headaches in formulating the RFC. <u>Id.</u>

The Commissioner counters that Mr. Whittle never –in his application (AR266) or during his testimony at the administrative hearing (AR36-39) -- claimed headaches as a basis for disability. Therefore, the Commissioner argues, the ALJ did not err by failing to incorporate headaches into the five-step sequential analysis—whether the headaches were caused by or related to Mr. Whittle's DAA or not. The Commissioner argues the ALJ was not required to develop the record or evaluate impairments that Mr. Whittle himself did not allege during the administrative proceedings contributed to his disability. See Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000; Rye v. Soc. Sec. Admin., 295 Fed. Appx. 110, 112 (8th Cir. 2008); Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The Commissioner further asserts that because Mr. Whittle's headaches are well controlled with medication, no limitations beyond those already contained within the RFC as formulated by the ALJ are necessary, so any error in failing to address headaches as a separate impairment is harmless. Hill v. Colvin, 753 F.3d 798, 800 (8th Cir. 2014).

The court has already determined this case must be remanded for a proper determination about whether Mr. Whittle's DAA is material to disability. On remand, it will become necessary, at steps four through six of the special procedure mandated by SSR 13-2p, for the ALJ to untangle Mr. Whittle's DAA from his remaining impairments to determine which impairments would remain in the absence of or would be affected by Mr. Whittle's DAA.

The ALJ will be required to consider all the effects of Mr. Whittle's DAA during the course of the proper DAA analysis, whether Mr. Whittle claimed

these effects as a separate medically determinable impairment or not. This will necessarily include Mr. Whittle's alleged headaches, and whether the headaches would continue to exist in the absence of Mr. Whittle's substance abuse. If, in the absence of DAA, the ALJ finds the headaches would not exist or would improve to the point of causing him no limitation, then no limitations need be included in the RFC. On remand, the ALJ should explicitly make this finding in the course of following the SSR 13-2p procedure.

## 2. Whether the ALJ Properly Determined if Mr. Whittle Met a Listing Level Impairment at Step 3 of the Sequential Analysis?

Mr. Whittle next asserts the ALJ erred at Step 3 by finding he did not have an impairment or combination of impairments that met or medically equaled a Listing. In support of this assertion, Mr. Whittle reiterates that, had the ALJ followed the mandate of 20 C.F.R. § 404.1535(b) and SSR 13-2p, all his severe impairments including DAA should have been included in the ALJ's initial disability evaluation. Mr. Whittle argues that had this occurred, a Listing level mental impairment would have resulted. This is exactly what Dr. McFarland concluded when she opined that Mr. Whittle's DAA caused the "A" criteria (appetite disturbance with change in weight; sleep disturbance, psychomotor agitation or retardation, decreased energy, thoughts of suicide) required to meet the § 12.04 Listing, along with two "marked" limitations in the "B" criteria for that Listing. See AR82.

Because the ALJ never conducted the appropriate inquiry under 20 C.F.R. § 404.1535(b) and SSR 13-2p, however, it never included and then excluded the effects of Mr. Whittle's DAA to determine whether Mr. Whittle's

Listing level mental impairment would have remained in the absence of his substance abuse.  As explained above, remand is required to conduct the proper inquiry.

The Commissioner responds in brief that Mr. Whittle has waived this argument because he only refers to the previous version of the Listing requirements when arguing that the State agency experts opined he met the Listing requirements for his mental impairments.  Compare 2016 version of 20 C.F.R. Pt. 404, Subpart P. App. 1, § 12:00.C.1-4 with 2017 version of  20 C.F.R. Pt. 404, Subpart P. App. 1, § 12:00.E.1-4.  The 2016 version was in effect when Mr. Whittle's claim was pending at the State agency level and when Mr. Whittle's claim was presented to the State agency psychologists in 2016 to render their opinions, but the 2017 version of the regulation had taken effect by late 2017 when Mr. Whittle's case went to hearing before the ALJ and when the ALJ rendered its written opinion in early 2018.  See *Revised Medical Criteria for Evaluating Mental Disorders*, 81 FR 66138-01, 2016 WL 5341732 (explaining that the new version became effective on January 17, 2017, and would be applied to new applications filed on or after that date and to claims that remained pending on or after the effective date).

One of the differences between the old and the new Listings for mental impairments is the wording of the four "B" criteria.  The old "B" criteria and the manner in which they were defined by the regulations were:

> **Activities of daily living** (12:00.C.1)include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories and using

87

a post office.  In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction. We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty in performing them without direct supervision, or in a suitable manner, or on a consistent, useful routine basis, or without undue interruptions or distractions.

**Social functioning** (12:00.C.2) refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.  You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.  We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity.  Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g. supervisors), or cooperative behaviors involving coworkers.  We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

**Concentration, persistence and pace** (12:00.C.3) refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.  Limitations in concentration, persistence and pace are best observed in work settings, but may also be reflected by limitations in other settings.  In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  Wherever possible, however, mental status examination or psychological test data should be supplemented by other available evidence.

On mental status examinations, concentration is assessed by tasks such has having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

In work evaluations, concentration, persistence or pace is assessed by testing your ability to sustain work using appropriate production standards in either real or simulated work tasks (e.g. filing index cards, locating telephone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or objective.

We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

We do not define "marked" by a specific number of tasks that you are able to complete, but by the nature and overall degree of interference with function. You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nonetheless find that you have a marked limitation in concentration, persistence and pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions and distractions.

**Episodes of decompensation** (12:00.C.4) are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence and pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased

treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g. hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within one year, or an average of once every 4 months, each lasting for at least 2 weeks.  If you have experienced more frequent episodes of a shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

See generally, 20 C.F.R., Pt. 404, Subpart P. App. 1, §12.00.C.1-4 (2016 version). The new "B" criteria, effective January 17, 2017, are:

**Understand, remember, or apply information** (12:00.E.1) This area of mental functioning refers to the abilities to learn, recall and use information to perform work activities.  Examples include: Understanding and learning terms, instructions, procedures; following one-or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.  These examples illustrate the nature of this area of mental functioning.  We do not require documentation of all the examples.

**Interact with others** (12:00.E.2) This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public.  Examples include:  cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.  These examples illustrate the nature of this area of mental functioning.  We do not require documentation of all the examples.

**Concentrate, persist, or maintain pace** (12:00.E.3) This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all the examples.

**Adapt or manage oneself** (12:00.E.4) This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in the work setting. Examples include: responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all the examples.

See generally, 20 C.F.R., Pt. 404, Subpart P. App. 1, §12.00.E.1-4 (2017 version).

The State agency opinions were rendered when the old regulations were in effect. See AR82 (initial level opinion rendered on March 30, 2016); and AR118 (reconsideration level opinion rendered on July 26, 2016). That Mr. Whittle argued the ALJ should have recognized the State agency consultant's opinion meant Mr. Whittle met or equaled a listing does not equate to a waiver of the argument that he met the "B" criteria—because Dr. McFarland applied the "B" criteria that were in effect at the time the opinion was rendered.

The opinions offered by Mr. Whittle's treating psychiatric providers were rendered after the new regulations went into effect. See AR2234-36 (Debby Bongers' opinion dated October 2, 2017); AR2238-40 (Dr. Bhatara's opinion dated October 30, 2017). Mr. Whittle's treating psychiatric provider's opinions, however, did track with the new regulations. They were asked to rate Mr. Whittle's limitations in four basic categories: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. Id.

Each of Mr. Whittle's treating providers indicated he had "marked" limitations in three of the four categories: sustained concentration and persistence; social interaction; and adaptation. So, whether the ALJ looked at Dr. McFarland's opinion under the old regulations or the treating providers' opinions under the new regulations, all of them indicated Mr. Whittle met the "B" criteria. But the ALJ disregarded all the medical opinions and set its own expertise against the opinions of the medical experts. As explained above, this was error. It is well established that an ALJ may not substitute its own opinion for that of the physicians, and may not draw its own inferences as to the relevance of the medical records. Combs, 878 F.3d 647; Strongson, 361 F.3d at 1070 (the ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports.").

On remand, the ALJ should reconsider whether, when Mr. Whittle's DAA is included in the initial disability determination, any of Mr. Whittle's mental impairments alone or in combination met or medically equal the severity of a

Listing at Step 3 of the sequential analysis, and if so, whether his impairment would continue to meet a Listing level should Mr. Whittle's substance abuse cease.

### 3. Whether the ALJ Properly Determined Mr. Whittle Could Return to Past Relevant Work?

At Step 4 of the sequential analysis, the ALJ found Mr. Whittle could return to his past relevant work as a gas station clerk (DOT 211.462-010) found at 1991 WL 671840, at the Get-N-Go. AR28. This, according to the ALJ, is light-duty, unskilled work with an SVP[18] of 2. Id. Mr. Whittle asserts this finding by the ALJ is not supported by substantial evidence for two reasons: (1) the Get-N-Go job does not meet the SSA's definition of past relevant work (PRW); and (2) there is an unexplained discrepancy between the DOT definition of the job and Mr. Whittle's appropriate RFC.

In a form completed by Mr. Whittle, he indicated he worked at Get-N-Go from March to April 2007, six days per week, nine hours per day, at a rate of $7.50 per hour. AR268. The wage records provided by this employer (AR255) indicate Mr. Whittle earned a total of $965 from Get-N-Go in 2007.

---

[18] SVP is an acronym for specific vocational preparation. See https://occupationalinfo.org/appendxc_1.html (all internet citations in this opinion were last checked May 15, 2019).

The SVP is a component of worker characteristics information found in the Dictionary of Occupational Titles (DOT), Appendix C. It represents the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. See https://www.onetonline.org/help/online/svp

Mr. Whittle asserts his job at the Get-N-Go does not qualify as past relevant work, even assuming he is capable of performing it (which he claims he is not). In support of this argument, Mr. Whittle directs the court to 20 C.F.R. § 404.1560(b)(1). That regulation defines past relevant work as work which a claimant has done within the past fifteen (15) years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to do it. Id.

Further, Mr. Whittle argues, pursuant to 20 C.F.R. § 404.1565, if a claimant has no work experience, has worked only "off and on," or has only worked for brief periods of time, such work is not considered past relevant work. And, pursuant to SSR 82-62, "an individual who has worked only sporadically or for brief periods of time during the 15-year period may be considered to have no relevant work experience." See SSR 82-62.

The SSA regulations also define substantial gainful activity (SGA) at 20 C.F.R. § 404.1572-1574. SGA is work activity that involves ongoing physical or mental activity, and gainful work activity is activity that is performed for pay or profit. 20 C.F.R. § 404.1572. The SSA has established an earnings test to determine whether work qualifies as SGA. 20 C.F.R. § 404.1574; SSR 83-33. In 2007, the SGA was $900 per month. Id. [19] If, however, a claimant works a job for 6 months or less but his impairment forced him to stop working or reduce the amount of work so that earnings fell below the SGA amount and

_____

[19] See also https://secure.ssa.gov/poms.nsf/lnx/0410501015 (table containing SGA for each year).

certain other conditions are met, such work is not considered to be substantial and gainful but is instead considered by the SSA to be an unsuccessful work attempt.  20 C.F.R. § 404.1574(c).

Mr. Whittle argues there is insubstantial evidence in the record to determine whether he worked an entire calendar month (either March or April of 2007) or whether he worked for 30 days—which is what an SVP 2 job may require to sufficiently learn how to do it. [20] Mr. Whittle further explains:  the disability report in the record (AR268) shows that Mr. Whittle reported working nine hours per day, six days per week at $7.50 per hour.  This would equal 54 hours per week.  The wage report for Get-N-Go shows Mr. Whittle earned a total of $965 from this employer.  AR255.  Dividing $965 by $7.50 equals only 128.7 hours, divided by 54 hours per week = 2.4 weeks.

Even if the court discounts Mr. Whittle's claim that he worked 54 hours per week and assumes he worked only 40 hours per week, 128.7 hours divided by 40 = 3.2 weeks—still less than the upper limit of 30 days to learn the SVP 2 job.

Assuming Mr. Whittle did work 54 hours per week and was paid overtime for the hours over 40 hours, his total earnings of $965 equate to 40 hours at $7.50=$300 plus 14 hours at $11.25 (time and a half) =157.50, for $457.50 per week.  This equates to a total of $965/$457.50 = 2.1 weeks of work.  This also is far short of the upper limit of 30 days to learn an SVP 2 job.  Any way it is

_____

[20] https://occupationalinfo.org/appendxc_1.html (explaining that SVP 2 jobs can require a training period "up to one month."

analyzed, Mr. Whittle argues, there is not substantial evidence in the record to conclude that his short career (between two and three weeks) at Get-N-Go in 2007 should qualify as past relevant work.

Mr. Whittle also cites case law in support of his position that the Get-N-Go did not amount to past relevant work: Reeder v. Apfel, 214 F.3d 984, 989 (8th Cir. 2000) (work that is only "off and on" or done for brief periods is not past relevant work); Robinson v. Secretary of Health & Human Services, 1988 WL 113296 (6th Cir. 1988) (unpublished) (guard shack job that was performed for less than three months not PRW); Stahovich v. Astrue, 524 F. Supp. 2d 95 (D. Minn. 2012) (insufficient evidence in the record that claimant's sporadic work as a gas station clerk was past relevant work).

The Commissioner counters that the ALJ's Step 4 finding is supported by substantial evidence because Mr. Whittle did not meet his burden of proving he was incapable of returning to his work as a gas station attendant. See Docket 21, p. 18. The Commissioner asserts it does not matter that Mr. Whittle's job at Get-N-Go may have lasted less than one month, so long as it lasted long enough for Mr. Whittle to learn the job, citing 20 C.F.R. § 404.1565(a).[21]

---

[21] 20 C.F.R. § 404.1565(a) states:
(a) General.  Work experience means skills and abilities you have acquired through work you have done which show the type of work you may be expected to do.  Work you have already been able to do shows the kind of work that you may be expected to do.  We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity.  We do not usually consider work you did 15 years or more before the time we are deciding whether you are disabled (or when the disability insured status requirement was last met, if earlier) applies.  A gradual change

The Commissioner claims the record indicates Mr. Whittle worked this job from March to April 2007, and the SVP 2 indicates such a job should only take "up to" 30 days to learn. It follows, therefore, that Mr. Whittle's time at Get-N-Go satisfied the duration requirement for past relevant work, citing Barrett v. Colvin, 2015 WL 1445546 (E.D. Okla., Mar. 30, 2015) (claimant's job of one month qualified as PRW because the job's SVP rating was a 2). The Commissioner also urges the ALJ was entitled to rely on Mr. Whittle's statement in the Disability report indicating he worked at Get-N-Go from March to April 2007, and that Mr. Whittle did not indicate any "gaps" in this one-month employment.

The Disability report Mr. Whittle submitted indicates he worked the Get-N-Go job from March to April 2007. AR268. It also indicates Mr. Whittle worked this job nine hours a day, six days a week, at $7.50 per hour. Using the wage report submitted by this employer (AR255) and the calculations in the previous pages, Mr. Whittle worked this job between two and three weeks. The

_____

occurs in most jobs so that after 15 years it is no longer realistic to expect that skills and abilities acquired in a job done then continue to apply. The 15-year guide is intended to insure that remote work experience is not currently applied. If you have no work experience or only worked "off and on" or for brief periods of time during the 15-year period, we generally consider that these do not apply. If you have acquired skills through your past work, we consider you have these work skills unless you cannot use them in other skilled or semi-skilled work that you can now do. If you cannot use your skills in other skilled or semi-skilled work, we will consider your work background the same as unskilled. However, even if you have no work experience, we may consider that you are able to do unskilled work because it requires little or no judgment and can be learned in a short period of time.

court has also carefully reviewed Mr. Whittle's hearing testimony regarding this job and the reason he left it.  See AR43; 46-49.  The ALJ asked Mr. Whittle relatively few questions about the Get-N-Go job.  AR43.  Mr. Whittle indicated he worked at Get-N-Go "just one month."  Id.  The ALJ asked Mr. Whittle about the physical requirements of the job.  Id.  The ALJ did not ask Mr. Whittle why he left the job, or whether he had learned how to do the job before he left it.  Id.

During examination by his representative, Mr. Whittle explained why he has not been able to keep a job:  "Because of my anxiety and panic attacks, I would start like violently throwing up and having diarrhea and my heart hurt. I thought I was having a heart attack, it hurt so bad." AR47.  "And I couldn't stop shaking and my muscles hurt and it just—it was really scary, that's why I would usually end up in the ER."  Id.  The representative asked Mr. Whittle if he was fired, or if he quit.  Id.  He said he "basically quit."  He further explained: "just being away from my apartment, I think, and the stress, like of just having so much to deal with at once, like so many customers to help and so much to do at once . . .just not being able to handle it all."  Id.  Mr. Whittle explained he would need to "go outside for a few moments to try to compose myself."  AR48.  He did this "several times a shift."  Id.  This was in addition to his normal breaks during an eight-hour shift.  Id.  During his longest (one month) employment, he estimated he called in sick at least three or four times. Id.  He also left work early because of his panic attacks.  AR49.

The court has considered the authority urged by the parties.   In Reeder the claimant argued her past work picking fruit should not have been

98

considered PRW.  <u>Reeder</u>, 214 F.3d at 989.  She asserted it should not have been considered PRW because the work was not substantial and gainful under 20 C.F.R. § 404.1574(b).  <u>Id.</u>  The court reiterated that to qualify as PRW, the work must have been done within the past 15 years, lasted long enough for the person to learn how to do it, and it must have constituted substantial gainful activity.  <u>Id.</u>  The court also acknowledged that substantial gainful activity was defined at 20 C.F.R. § 404.1572-1574.  <u>Id.</u>  But the court decided that the claimant's fruit picking job qualified as PRW because the reason her earnings were below the guideline amount was because she chose to only work on a seasonal basis.  <u>Id.</u>  "Her low earnings are more the result of her choice to work only seasonally than an indicator of a physical or mental inability to work the entire year."  <u>Id.</u>  The court therefore found the decision to find the claimant's fruit picking job was PRW was correct.  <u>Id.</u>

In <u>Robinson</u>, the claimant argued the ALJ erred by finding his past job as a security man in a guard shack was PRW.  <u>Robinson</u>, 1988 WL 113296 at *2. Regarding work a claimant had performed only for short periods of time, the court cited 20 C.F.R. § 404.1565 which explains that work that has been performed in the last 15 years which was only "off-and-on *or for brief periods of time*" does not apply as PRW.  <u>Id.</u>  The court also referred to SSR 82-62, which contains the similar language.  <u>Id.</u>  The court found that because the claimant had held the guard shack job so long ago (more than three to five years in the past) and for such a short time (two months) the finding that the job was PRW was not supported by substantial evidence.  <u>Id.</u> at *3.  This was because the

testimony of the VE in the case suggested the guard shack job was not PRW, but the Commissioner nevertheless ruled that it was—thereby finding the claimant was not disabled.  Id.  The court explained:

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision.  Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.
>
> Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).
>
> The record in this case is devoid of any evidence or documentation that would resolve the issue of whether or not the plaintiff's guard shack job was of sufficient duration to qualify as past relevant work other than the testimony of [the VE] which establishes that it is not.

Id. at *3 (citing SSR 82-62).

In Stahovich, the claimant argued the ALJ erred by finding his past work as a gas station attendant qualified as PRW.  Stahovich, 524 F. Supp. 2d at 101.  The court agreed.  Id. at 105.  In Stahovich, the claimant had worked a wide variety of jobs in the distant past, including as a gas station attendant. Id. at 96.  The ALJ ultimately deemed the gas station attendant job PRW, but it was unclear when, exactly, the claimant had performed this work.  Id. at 102.

The court noted the 15-year time period had not been interpreted as an absolute rule and in appropriate cases work outside that time frame could be PRW.  Id.  at 102-03.  Instead, work which had been done outside the 15-year time frame was only *presumed* to be inapplicable.  Id.  But, the court

emphasized, the proper determination regarding PRW requires a number of inquiries—none of which the ALJ had undertaken in Mr. Stahovich's case.[22] "The instant record, however, contains no searching inquiry as to any of these questions." Id. at 103. The questions include: when the work was done, whether it lasted long enough for the claimant to know how to do it, whether the work skills acquired continue to apply, and whether the work was only "off and on" or for a brief period of time. Id. There was no evidence in the record to answer any of these questions. The court remanded the case because there was insubstantial evidence in the record to conclude the claimant's work as a gas station attendant qualified as PRW. Id. at 104.

In Barrett, the claimant asserted the ALJ erred by finding at Step 4 of the sequential analysis that his past work as a pizza delivery person qualified as PRW. Barrett, 2015 WL 1445546 at *2. The court acknowledged that to qualify as PRW, the claimant's past work must have occurred within the past 15 years, been of sufficient duration to allow the claimant to learn how to do it, and it must have been substantial gainful employment. Id. The court also noted that in Mr. Barrett's case, the ALJ found the recency requirement was met because he had worked as a pizza delivery person in 2010 and the hearing was held in 2012. Id. at **1-2. The duration requirement was met because

---

[22] The Commissioner argues Stahovich is inapplicable because the issue in that case was whether the work was outside the 15-year time limit— something that is not in dispute here. The court disagrees. The Stahovich court indicated the 15-year time limit was only one of the relevant inquiries the ALJ failed to make when deciding whether the job should qualify as PRW. Stahovich 524 F. Supp. 2d at 103.

Mr. Barrett worked at this job for one month, because the job's SVP rating was a 2. Id. at 2. The earning requirement was also met because Mr. Barrett earned $1,340 for the month he worked. Therefore, the court held, the ALJ did not err in finding the pizza delivery job PRW. Id.

The court also finds Cheney v. Comm'r, 2011 WL 1839785 (D. Ver., Apr. 19, 2011) persuasive. In that case, the claimant had worked a variety of jobs before she applied for disability at a relatively young age (twenty). Id. at *1. Her alleged disabilities included several mental disorders. Id. The ALJ found the claimant was not disabled because it found at Step 4 of the sequential analysis that she could return to PRW as a chambermaid. Id. at *3. The ALJ found the claimant could return to her PRW as a chambermaid because she had performed that job "sufficiently long enough for [it] to be considered past relevant work." Id. The Cheney court did not take issue with the duration or recency requirements for PRW (i.e. that the job had been performed within the past 15 years or that it had lasted long enough for the claimant to learn how to do it).

The claimant argued, however, that the ALJ had erred in finding this job PRW because it did not constitute SGA. Id. at *4. The claimant argued that under 20 C.F.R. § 404.1574(c), work is not substantial and gainful but is instead an unsuccessful work attempt if "after working for a period of three months or less, the work was terminated or markedly reduced due to the claimant's impairment or due to the removal of special conditions essential to further performance of the work." Id. (citing 20 C.F.R. § 404.1574(c)). The

claimant in <u>Cheney</u> argued the ALJ should have further developed the record to determine whether her brief tenure as a chambermaid was PRW or an unsuccessful work attempt. <u>Id.</u> The court found the ALJ failed to make any appropriate inquiry, but instead—based solely on the observation that the chambermaid job met the recency, duration, and earnings requirement, determined that it qualified as PRW. <u>Id.</u> at *6-7. The court concluded the ALJ should have made further inquiry before determining the claimant's brief employment chambermaid job did in fact qualify as PRW, or whether she was unable to perform that job because of her mental illness. <u>Id.</u> at *7, 11 (case remanded for further proceedings).

The court in <u>Smith v. Apfel</u>, 157 F.3d 571 (8th Cir. 1998), likewise reversed the SSA's finding that the claimant's brief work for nine weeks constituted substantial gainful activity/past relevant work. <u>Id.</u> The court cited 20 C.F.R. § 404.1574, and noted that earnings from work that a claimant performs but is forced to stop after a short time because of an impairment will not be considered substantial gainful activity. <u>Id.</u> at 572. The court's view of the record was that it was "very clear" Mr. Smith was not able to continue his work because of his impairment. "This is demonstrated not only by his own testimony, but by the medical evidence in the record . . ." <u>Id.</u> <u>See also Andler v. Chater</u>, 100 F.3d 1389, 1392 (8th Cir. 1996) (work that lasted less than three months but quit because of impairment not substantial gainful activity); <u>King v. Chater</u>, 72 F.3d 85, 86 (8th Cir. 1995) (same); <u>Sample v. Shalala</u>, 999 F.2d 1138, 1142 (7th Cir. 1993 (same).

The court finds the ALJ did not conduct a sufficient inquiry to determine whether Mr. Whittle's work at the Get-N-Go qualifies as PRW. Despite the information in the Disability report and Mr. Whittle's hearing testimony that Mr. Whittle worked at the Get-N-Go from March to April 2007, the numbers from the Disability report along with the information provided from the employer make it clear there is no way Mr. Whittle worked at the Get-N-Go for 30 days.

Additionally, the only information in the record regarding the reason Mr. Whittle left the Gen-N-Go job is his own testimony that he quit because his mental condition did not allow him to continue. And there is absolutely no information in the record to indicate whether Mr. Whittle's (at most) three-week tenure at the Get-N-Go was enough time to allow him to learn the duties of this job. The ALJ undertook no inquiry about any of these issues. And it undertook no discussion about why, under the circumstances presented, Mr. Whittle's employment should be considered PRW rather than work that was merely "off and on" or undertaken for a brief period of time, unsuccessful, or otherwise too short to be considered substantial gainful activity which could qualify as past relevant work. On remand the ALJ is instructed to undertake a more thorough review of the circumstances of Mr. Whittle's Get-N-Go employment to determine whether or why it in fact qualifies as PRW.

Mr. Whittle also argues there was a discrepancy between the DOT description of gas station clerk (DOT 211.462-010) and the RFC Mr. Whittle was capable of performing which was not adequately addressed by the ALJ.

104

The ALJ stated in its decision that "the vocational expert testified that his answers were consistent with the Dictionary of Occupational Titles pursuant to SSR 00-4p." But Mr. Whittle asserts the VE offered no such testimony, and that the ALJ never inquired to the VE whether it was consistent with the DOT. Therefore, Mr. Whittle argues, the ALJ's determination of consistency does not comply with SSR 00-4p which states in relevant part, "at the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency."

In brief, the Commissioner concedes the ALJ did not inquire to the VE whether his testimony was consistent with the DOT. <u>See</u> Docket 21, p. 21. But this was harmless error according to the Commissioner, because the Commissioner asserts no conflict existed. <u>Renfrow v. Astrue</u>, 496 F.3d 918, 920 (8th Cir. 2007).

Mr. Whittle asserts conflicts do exist for these reasons: (1) The RFC as articulated by the ALJ and the hypothetical to the VE both limited Mr. Whittle to work which required understanding, remembering and carrying out only simple, routine and repetitive tasks; and (2) the RFC as articulated by the ALJ and the hypothetical to the VE both limited to Mr. Whittle to work which had only occasional and superficial contact with coworkers and the public. Neither of these portions of the RFC, Mr. Whittle argues, is consistent with the DOT description of gas station attendant.

Mr. Whittle and the Commissioner agree the gas station clerk job requires a reasoning level of 3 in the GED (general education development)

component of the DOT description.  Mr. Whittle argues that a reasoning level of 3 is inconsistent with work that requires only simple, routine and repetitive tasks.  The DOT's definition of reasoning level 3 is "the ability to carry out instructions furnished in written, oral or diagrammatic form dealing with problems involving several concrete variables."  See 1991 WL 671840.  The Commissioner cites Renfrow, 496 F.3d at 921; and Hillier v. Soc. Sec. Admin., 486 F.3d 359, 367 (8th Cir. 2007), for the proposition that unskilled jobs up to a reasoning level of 3 are consistent with RFC limitations to simple, concrete instructions.  The Commissioner is correct that the Eighth Circuit has held a job with a level 3 reasoning requirement is consistent with an RFC which allows for simple, concrete instructions.  Renfrow, 496 F.3d at 921;  Hillier, 486 F.3d at 367.

The court is more concerned, however, with the RFC limitation of only superficial and occasional contact with the public.  Regarding this limitation, the VE testified "that would be possible for someone who is a gas station attendant and clerk.   The contact that they have with the public is very, very much superficial *and occasional would be a third of the day, so maybe depending on how busy the particular gas station is, but generally I would say would be possible with that limitation.*"  AR65.

But the DOT definition of gas station attendant appears to indicate the ability to interact with people is "significant" and that dealing with people (reaching, handling, talking, and hearing--is required *frequently*—in other words *at least* 1/3 and up to 2/3 of the time.  See 1991 WL 671840.

Clarification is necessary to determine whether, in the real world, there are gas station attendant jobs in which a person is actually required to interact with the public only 1/3 or less of an eight-hour shift. The VE's testimony did not address this apparent conflict.

The VE stated that depending on how busy the gas station was it would be possible to meet the "occasional" limitation, but the VE did not address whether the DOT definition of the gas station attendant met that requirement or whether any such gas station attendant job existed in the real world. The court would venture a guess probably not—especially in the age of self-service gas stations where the gas station attendant's job has been transformed into a full-time cashier, waiting on people who are required to pay for their gas at the pump but who then come into the station solely to buy snacks, pop, beer and lottery tickets. Remand is required.

## F.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Mr. Whittle requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the

court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues

have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED May 15, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge